Taiko GOTO, Petitioner,

v.

DISTRICT OF COLUMBIA BOARD OF
ZONING ADJUSTMENT, Respondent,

Milton M. Gottesman, Citizens Association of Georgetown, Intervenors.

No. 13491.

District of Columbia Court of Appeals.

Argued April 26, 1979.

Decided Nov. 5, 1980.

Whayne S. Quin, Washington, D. C., with whom Norman M. Glasgow and Norman M. Glasgow, Jr., Washington, D. C., were on the briefs, for petitioner.

Leo N. Gorman, Asst. Corp. Counsel, Washington, D. C., with whom Louis P. Robbins, Acting Corp. Counsel, at the time the brief was filed, and Richard W. Barton, Deputy Corp. Counsel, Washington, D. C., at the time the brief was filed, were on the brief, for respondent.

Milton M. Gottesman, Washington, D. C., with whom Courts Oulahan, Washington, D. C., was on the brief, for intervenors.

Before KELLY, GALLAGHER and FER-REN, Associate Judges.

FERREN, Associate Judge:

Petitioner Taiko Goto seeks review of an order of the Board of Zoning Adjustment (the Board or BZA) which reversed an earlier determination by the Zoning Administrator that Goto could build a kiln at the rear of her pottery shop without a permit. She contends the Board should have held that principles of laches and estoppel barred the Citizens Association of Georgetown (CAG) and Milton Gottesman from appealing the Zoning Administrator's decision to the BZA. We agree as to laches and reverse.[1]

## I.

Since 1974, Taiko Goto has leased a store at 2605 P Street, N.W., in Georgetown, for use as a ceramics workshop. The area is zoned C-1, which permits "neighborhood shopping." District of Columbia Zoning Regulations § 2101.14 (1979). In early 1974, Goto wished to build a gas-fired kiln in the

---

1. We accordingly need not deal with Goto's contention that the Board erred in concluding that she required a permit because the kiln is a "building" or building addition and because a gas pipe connecting the kiln to the shop building constitutes a "communication" between buildings within the meaning of District of Columbia Zoning Regulations § 1202 (1979).

rear yard of her shop. She consulted with Mr. Krassensky, Chief of the Mechanical Section, Engineering Branch, Bureau of Building, Housing and Zoning (now a branch of the Building Division of the Building and Zoning Regulation Administration).[2] Krassensky told Goto that she could build the kiln without a permit if the kiln were set back from the walls of the existing structure and used less gas than a residence. Goto began constructing the kiln in November 1974.

Soon thereafter, Milton Gottesman, the owner of the adjacent property to the rear of Goto's shop, and Eva Hinton, Chairperson of CAG's Committee on Zoning and Planning, complained of the kiln to James J. Fahey, the Zoning Administrator. See note 2 supra. Fahey investigated the complaint and orally advised Goto to stop construction until she obtained a permit, and to submit plans for the kiln to his office. Goto submitted plans showing the kiln attached to the main building. Joseph Bottner, Chief of the Zoning Review Branch (under Fahey), see note 2 supra, advised her that the BZA would have to approve construction of the kiln.

Goto amended the plans to show the kiln as a separate structure and submitted them next to Howard A. Osborg, Chief of the Engineering Branch, Inspection (now Building) Division. See note 2 supra. Osborg determined that a permit was not required

for the kiln and made a notation to that effect, dated April 30, 1975, on a letter to the owner of the property leased by Goto for her shop. Fahey, the Zoning Administrator, appealed Osborg's decision to Fahey's superior, William Dripps, Chief of the Bureau of Building, Housing and Zoning (now Building and Zoning Regulation Administration). See note 2 supra. In May 1975, Dripps sustained Osborg's determination that Goto could construct the kiln without a permit. Gottesman and Hinton had notice of this decision by June 1975. Goto completed the kiln and began to operate it by August 1975.[3]

On November 18, 1975, Gottesman and Hinton met with Dripps, who reiterated his opinion·that the kiln required no permit. At Hinton's request, Fahey wrote a letter on January 6, 1976, reflecting Dripps' position.[4] Hinton (on behalf of CAG) filed an appeal with the BZA on March 4, 1976, contesting the decision in Fahey's letter. Gottesman intervened as an appellant at the end of the first public hearing on July 21, 1976.

Goto did not learn of the appeal until May 25, 1976, when she heard of it from the owner of her leased property, who had received notice, and from her attorney, who read about the appeal on a BZA agenda. Goto's attorney made a motion to dismiss the BZA proceedings for lack of jurisdic-

---

2. Effective July 3, 1975, the Department of Housing and Community Development of the District of Columbia government employed all the officials who were involved in the controversy concerning Goto's kiln. The Corporation Counsel's office provided the court with organizational charts showing the hierarchy of the officials involved in this case as follows:

DEPARTMENT OF HOUSING AND COMMUNITY DEVELOPMENT
Director
|
Building and Zoning Regulation Administration
Administrator—Dripps

Building Division      Zoning Division
|      Administrator—Fahey
Engineering Branch    |
Chief—Osborg    Zoning Review Branch
|    Chief—Bottner
Mechanical Section
Chief—Krassensky

3. Goto initially used propane gas to fire the kiln. By February 1976, after public hearings, the Public Service Commission granted Goto permission to use natural gas (this service was not automatic for new hookups). Goto obtained natural gas service by April 1976.

4. Fahey's letter of January 6, 1976, informed Hinton:

This office has reviewed the kiln located at the rear of 2605 P Street, N.W. It has been determined that the kiln is not a building, but an accessory structure and, therefore permitted to be located within the rear yard.

tion, as well as on grounds that laches barred CAG's appeal and that Goto's reliance on the prior decisions of District officials estopped the Board from requiring a permit. More specifically, Goto contended that the Board lacked jurisdiction to hear the appeal because (1) it was not timely filed, (2) CAG did not comply with the rules of the Board regarding authorization of the appeal, and (3) CAG was not a "person aggrieved" by Fahey's January 6 decision letter, within the meaning of the District of Columbia Zoning Act, D.C.Code 1973, § 5–420, and Zoning Regulations § 8102.1 (1979). Before the first public hearing, the Board denied the motion as to the jurisdictional grounds. The Board then considered Goto's kiln on three days of hearings between July 1976 and April 1977. In its final order of March 28, 1978, the Board reaffirmed its jurisdictional ruling, rejected the defenses of laches and estoppel, and concluded that a permit was required for construction of the kiln. Goto petitions for review of the Board's decision. *See* D.C.Code 1973, §§ 11–722, 17–303; *id.* 1978 Supp., § 1–1510.

## II.

We first consider the three jurisdictional issues which Goto raised initially in her motion to dismiss the proceedings before the Board.

A. Goto contended that Hinton lacked authority to bring an appeal on behalf of CAG because the organization had not au-

thorized her to do so. Hinton failed to attach to the appeal form a letter from CAG authorizing Hinton to act on its behalf, although the form directed: "If appeal is filed by agent of the appellant, Form 1 (Notice of appeal) shall be accompanied by a letter signed by the appellant authorizing the agent to act on his behalf in this appeal." Goto argues that this deficiency in the filing of the appeal deprived the Board of jurisdiction.

■ We cannot agree. Although the Zoning Regulations dictate that appeal forms must be complete at the time of filing,[5] the error here was not substantial. On February 26, 1976, before the appeal was filed, CAG, by resolution, authorized Hinton to act in its behalf in filing an appeal against *Dripps'* oral decision to allow construction of the kiln. Because it was *Fahey's* written decision (reflecting Dripps' view) that CAG apparently wished to contest, on June 21, 1976, CAG ratified Hinton's filing of the appeal against Fahey. This action eliminated any doubt that Hinton had authority to act as CAG's agent. The purpose of the BZA's authorization-letter requirement—*i. e.*, that the Board should not be party to unauthorized appeals—was adequately fulfilled in this case.

■ B. Goto also contended that CAG was not a "person aggrieved" within the meaning of the Zoning Act[6] and Regulations[7] and thus was not entitled to appeal

---

5. The Zoning Regulations provide:

    Each appeal or application to the Board shall be made on the appropriate form provided by the *Board* and all information required by such form shall be furnished by the appellant or applicant at the time of filing the appeal.

    District of Columbia Zoning Regulations § 8203.1 (1979) (emphasis in original).

6. The statute provides:

    Appeals to the Board of Adjustment may be taken by any person aggrieved, or organization authorized to represent such person, or by any officer or department of the government of the District of Columbia or the Federal Government affected, by any decision of the inspector of buildings granting or refusing a building permit or granting or withholding a certificate of occupancy, or

any other administrative decision based in whole or part upon any zoning regulation or map adopted under sections 5 413 to 5 428. D.C.Code 1973, § 5 420.

7. The regulations track the language of the statute:

    The Zoning Act of June 20, 1938 (52 Stat. 797), as amended, provides that appeals to the Board of Zoning Adjustment may be taken by any person aggrieved, or organization authorized to represent such person, or by any officer or department of the government of the District of Columbia or the Federal Government affected, by any decision of an administrative officer granting or refusing a building permit or granting or withholding a certificate of occupancy or any other administrative decision based [i]n whole or part

Fahey's decision that no permit was required to build the kiln. The Board rejected her argument, stating in its final order:

The Association and Mr. Gottesman are both "persons aggrieved" within the meaning of the Zoning Regulations. Mr. Gottesman lives immediately behind the subject site. The Association represents residents of both the immediate and the general area, and has had a long standing history of appearing in zoning matters before the Board.

We need not deal with the issue of the CAG's standing as a "person aggrieved" before the Board[8] because Gottesman, the intervenor-appellant, had standing to support the appeal.[9]

upon any zoning regulations or zoning maps adopted pursuant to the Zoning Act.
District of Columbia Zoning Regulations § 8102.1 (1979).

8. We do not reach the question—addressed in Judge Kelly's opinion, *post* at 929, concerning the breadth of the "person aggrieved" requirement in the zoning context. As set forth in notes 6 and 7 *supra*, the Zoning Act and Regulations permit only a "person aggrieved" to appeal a decision of a zoning administrator to the BZA. *Cf. DeLevay v. District of Columbia Rental Accommodations Commission*, D.C.App., 411 A.2d 354, 359 (1980) (regulation permitting appeal from Rental Accommodations Office to Commission by "any person adversely affected" exceeds statutory authorization of appeal by "aggrieved party"). Because we conclude that Gottesman had standing to appeal to the BZA, we need not determine whether the "person aggrieved" language of the zoning laws is broad enough to allow appeal of a zoning decision to the BZA by CAG, a neighborhood organization, absent an allegation of specific injury to its members. We note that the issue of standing to appeal an administrative decision to higher administrative authority is primarily one of statutory construction. *See id.* at 358 60. Administrative appeals do not necessarily depend on the elements of standing that judicial review would require. *See* 3 K. Davis, Administrative Law Treatise § 22.08 at 239 40 (1958); 3 A. Rathkopf, The Law of Zoning and Planning § 37.03, at 37 40 & n.2, 37 49 (4th ed.) (April 1979).

For completeness, we note that the question of CAG's standing to appeal to the BZA is conceptually separate from the question of its standing to petition this court for review of a BZA decision adverse to its interests. If, for example, an agency imposes sanctions on a person not party to a complaint, that person may petition for review here in spite of—indeed because of—the absence below. *See Ammerman v. District of Columbia Rental Accommodations Commission*, D.C.App., 375 A.2d 1060, 1063 (1977). Nonetheless, when a person has the opportunity to present a complaint to an agency having jurisdiction, the failure to do so may preclude a petition for review of agency action by the court. *See DeLevay, supra* at 358. We note, finally, that when agency action in other contexts has adversely affected CAG's interests, this court has entertained CAG's petition for review. *See Citizens Ass'n of Georgetown v. Simonson*, 131 U.S.App.D.C. 152, 153, 403 F.2d 175, 176 (1968) (per curiam), *cert. denied*, 394 U.S. 975, 89 S.Ct. 1454, 22 L.Ed.2d 755 (1969) (Congressional direction to Alcoholic Beverage Control Board to consider "the wishes of the persons residing or owning property in the neighborhood" in issuing licenses and CAG's allegation that many members reside or own property within neighborhood establishes nexus between plaintiff's interests and adverse action of defendants required to support judicial review of relicensing of saloon); *Citizens Ass'n of Georgetown v. District of Columbia Alcoholic Beverage Control Bd.*, D.C.App., 288 A.2d 666, 669 (1972) (CAG has standing to seek D.C.Court of Appeals review under § 1 1510 of issuance of liquor license) (citing *Simonson, supra*). *See generally Basiliko v. Government of the District of Columbia*, D.C.App., 283 A.2d 816 (1971); K. Davis, Administrative Law of the Seventies §§ 22.00 .21 (1976 & Supp.1980). *See also* French, *Broadened Concepts of Standing in the Local District of Columbia Courts*, 23 How.L.J. 255 (1980).

9. The Zoning Regulations contain no provision for intervention. The Board presumably allowed intervention pursuant to its Supplemental Rules of Practice and Procedure, which provide:

At the time of the hearing on the appeal, the Board may in its discretion and for good cause shown, permit interested persons to intervene in the appeal for such general or limited purpose as the Board may specify.
Supplemental Rules of Practice and Procedure Before the Board of Zoning Adjustment, 22 DCRR § 2.4 (1972).

The cases cited in the text below generally construe Fed.R.Civ.P. 24, which regulates intervention in federal courts:
"Ordinary interveners [in administrative proceedings], as distinguished from public interest ones, are treated about the way interveners in a civil action in a federal court are treated." K.

■ As a rule, an intervenor joins a preexisting dispute and cannot cure a jurisdictional defect in the original case. Intervention ordinarily will be denied if the intervenor is the only party who fulfills jurisdictional prerequisites. *See, e. g., McClune v. Shamah,* 593 F.2d 482, 486 (3d Cir. 1979) (district court properly denied motion of limited partnership to intervene in suit by limited partners when original plaintiffs lacked standing to assert claims); *Gebhard v. GAF Corp.,* 59 F.R.D. 504, 507–08 (D.D.C. 1973) (motion of employee to intervene in age discrimination suit by fellow employees denied when original plaintiffs failed to satisfy jurisdictional prerequisite of filing timely notice with EEOC); *cf. Lidie v. California,* 478 F.2d 552, 555 (9th Cir. 1973) (motion of food stamp applicants to add other plaintiffs properly denied when original plaintiffs were not qualified to represent class). In other words, an intervenor cannot come into a case that is not really there.

■ The courts, however, have established a narrow exception to this rule. In order to avoid excessive technicality, expense, and delay, a court in limited circumstances may treat an intervenor's claim as a separate action and decide the matter, while dismissing the original action. A court, accordingly, may invoke this exception only if there is an independent jurisdictional basis for the intervenor's claim and failure to adjudicate the claim would result in unnecessary delay. *See, e. g., Miller & Miller Auctioneers, Inc. v. G. W. Murphy Industries, Inc.,* 472 F.2d 893, 895–96 (10th Cir. 1973) (district court lacked interpleader jurisdiction over original defendant but still

had jurisdiction to award judgment to intervenor-defendant); *Atkins v. State Board of Education,* 418 F.2d 874, 876 (4th Cir. 1969) (per curiam) (original plaintiff failed to show standing to bring desegregation suit; case remanded so that parents of schoolchildren could intervene); *Fuller v. Volk,* 351 F.2d 323, 328–29 (3d Cir. 1965) (district court lacked jurisdiction over original plaintiffs; case remanded to determine whether court had independent basis for jurisdiction over intervenor-plaintiffs); *Hunt Tool Co. v. Moore, Inc.,* 212 F.2d 685, 688 (5th Cir. 1954) (permissive intervention with independent jurisdictional grounds survives dismissal of original suit); 7A C. Wright & A. Miller, Federal Practice and Procedure § 1920, at 613 (1972).

■ We are persuaded that Gottesman's intervention falls within this exception. First, because Gottesman's property adjoined Goto's, the Board had a basis for jurisdiction over Gottesman's claim independent of its jurisdiction over CAG's appeal. Generally, persons wishing to contest zoning determinations must demonstrate some damage—damage greater than that suffered by the general public—to satisfy the "person aggrieved" requirement. *See* 3 A. Rathkopf, The Law of Zoning and Planning § 37.03, at 37–52 & n.35 (4th ed.) (April 1979). Members of the Board, however, apparently assumed that, as the adjoining property owner, Gottesman did not have to claim any special damage to intervene in this case.[10] We agree. A property owner has a sufficient interest in the zoning of adjoining property to permit an appeal on the basis of that interest alone, without

Davis, Administrative Law of the Seventies, *supra* § 8.11, at 293.

**10.** The following colloquy occurred at the end of the July 21, 1976, hearing:

MR. HARPS [of the Board]: That will be for my file. Anything I request you must also send to Mr. Gottesman and Mrs. Hinton.

MR. QUIN [Goto's attorney]: There is only one party here and you are identifying them both?

MR. HARPS: Mr. Gottesman is the man next door and I cannot eliminate him from this case. He is the man next door.

MR. QUIN: He did not take the appeal.

MR. HARPS: You cannot get any closer.

MR. HATTON: The Board will determine who are the parties.

MS. CUMMINGS [of the Board]: He can be made a party.

MR. GOTTESMAN: I can pay the fee and become a party. I move to intervene as a party.

MR. HARPS: Granted. I do not think the Board will reverse me on that.

additional allegations of interest or injury. *See Weiner v. City of Los Angeles*, 68 Cal.2d 697, 706, 441 P.2d 293, 300, 68 Cal. Rptr. 733, 740 (1968) (en banc); *Gnau v. Seidel*, 25 Md.App. 16, 25–26, 332 A.2d 739, 744–45 (Ct.Spec.App.1975); 3 A. Rathkopf, *supra* § 37.03, at 37–46 to –47; Comment, *Standing to Appeal Zoning Determinations: The "Aggrieved Person" Requirement*, 64 Mich.L.Rev. 1070, 1079 & n.63 (1966). Accordingly, any defect in CAG's jurisdictional assertions, *see* note 8 *supra*, does not apply to Gottesman.

Second, failure to adjudicate Gottesman's claim would result in unnecessary delay in the resolution of this case. In reliance on advice of Building Division officials, Goto began building her kiln in November 1974. She completed and began operating it in August 1975, five years ago. CAG instituted its appeal in March 1976, and Gottesman intervened in July of that year. The Board issued its final order on March 28, 1978. To dismiss the case for lack of jurisdiction at this late stage would only further protract this lengthy proceeding and disserve the interests of justice.

Third, permitting the case to proceed on the strength of Gottesman's standing does not prejudice any party. *See United States Steel Corp. v. EPA*, 614 F.2d 843, 846 & n.4 (3d Cir. 1979) (intervenor-plaintiff permitted to proceed after dismissal of original plaintiff when defendant on notice of intervenor's claims); *Atkins, supra* at 876 (case remanded to permit intervention by new plaintiffs when change would not cause prejudice). Gottesman has been involved in a timely fashion. *See* note 10 *supra*. As an immediate neighbor, he would be a proper appellant before the Board. Furthermore, the interests of Gottesman and CAG have been closely identified with each other throughout this proceeding. Gottesman testified as a witness for CAG before he intervened; Gottesman and CAG filed a single brief in this court. In these circumstances, no party can claim lack of notice of Gottesman's participation or claims.

Finally, no evidence of record suggests that Gottesman intervened in order to save the Board's jurisdiction, although in retrospect his entry may have had that effect. *See* note 8 *supra*. *Compare United States Steel Co., supra* at 846 (intervention after dismissal of original plaintiff permitted when intervenor was attempting only to protect own interests, not to cure jurisdictional defect) *with McClune, supra* at 486 (intervention properly denied when directed toward forestalling defendants' argument that original plaintiffs lacked standing to assert certain claims). The parties appear to have assumed CAG's standing. Gottesman has participated in this proceeding from the beginning. There is no indication that this case presents an effort to create sham jurisdiction.

We accordingly treat CAG's pleadings as those of Gottesman and conclude that the Board had jurisdiction to consider the appeal.

■ C. Finally, there is the question whether CAG's appeal was timely filed. The question of timeliness is jurisdictional; if the appeal was not timely filed, the Board was without power to consider it. *See Bertrand v. Zoning Board of Review*, 99 R.I. 329, 331–32, 207 A.2d 604, 605 (1965).

■ By rule, the Board requires appeals to be filed in merely a "timely" manner.[11] When an administrative agency has not adopted a specific time limit on appeals, a reviewing court should apply a standard of reasonableness.[12] *See State ex rel. Housing*

---

11. The BZA's Supplemental Rules of Practice and Procedure provide in part:

    Any person aggrieved by any order, requirement, decision, determination, or refusal made by any administrative officer or body . . . in the administration or enforcement of the Zoning Regulations, may file a *timely* appeal with the Board . . . .

Supplemental Rules of Practice and Procedure Before the Board of Zoning Adjustment, 22 DCRR § 2.21 (1972) (emphasis added).

12. We agree, however, with cases and commentators that a specific time limit on appeals would serve the salutary purpose of increasing certainty and predictability for all parties to Board proceedings. *See Keating v. Zoning Bd. of Appeals*, 325 A.2d 521, 523-25 (Me.1974);

*Authority v. Wind*, 337 S.W.2d 554, 558 (Mo.Ct.App.1960); *Cave v. Zoning Board of Appeals*, 49 A.D.2d 228, 231, 373 N.Y.S.2d 932, 935 (App.Div.1975).

In considering whether CAG's appeal was timely filed, the Board began to run the clock with Fahey's letter of January 6, 1976, although CAG had oral notice of that decision six months earlier. In its final order, the BZA concluded: "[T]he written ruling dated January 6, 1976 was the first action which could be appealed to the Board." The BZA cites nothing in its order indicating that appeal lies only from a written decision, nor do the regulations explicitly establish such a requirement. According to the Zoning Act and Regulations, an appeal will lie from "any decision of an administrative officer granting or refusing a building permit or granting or withholding a certificate of occupancy or any other administrative decision based [i]n whole or part upon any zoning regulations or zoning maps adopted pursuant to the Zoning Act." District of Columbia Zoning Regulations § 8102.1 (1979); *see* D.C.Code 1973, § 5–420; notes 6–7 *supra*. In similar circumstances, courts in other jurisdictions have concluded that a verbal decision is an appealable order which begins the running of the time for appeal. *See State ex rel. Beacon Court Inc. v. Wind*, 309 S.W.2d 663, 665–66 (Mo.Ct. App.1958); *Hunter v. Board of Appeals*, 4 A.D.2d 961, 962, 168 N.Y.S.2d 148, 150–51 (App.Div.1957) (mem.).

■ We conclude, however, that we cannot appropriately overrule the Board's construction of the Act and Regulation. Administrative determinations regarding an agency's internal procedures are entitled

to due respect and should not be reversed unless "clearly wrong." *Capitol Hill Restoration Society v. Zoning Commission*, D.C. App., 380 A.2d 174, 181–82 (1977), *overruled on other grounds, Citizens Association of Georgetown v. Zoning Commission*, D.C. App., 392 A.2d 1027 (1978) (en banc); *see Leefer v. Administrator, National Aeronautics & Space Administration*, 177 U.S.App. D.C. 62, 66, 543 F.2d 209, 213 (1976) (per curiam) (agency interpretation of its regulations honored unless "plainly erroneous or inconsistent with the regulations") (quoting *Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410, 414, 65 S.Ct. 1215, 1217, 89 L.Ed. 1700 (1945)). Applying that test, we conclude it was not clearly wrong for the Board to calculate timeliness of CAG's appeal by reference to the written order; thus, we defer to that interpretation. *See Gueory v. Hampton*, 167 U.S.App.D.C. 1, 4–5, 510 F.2d 1222, 1225–26 (1974); *Wasserman v. Udall*, 234 F.Supp. 651, 654 (D.D.C. 1964).[13] Our deference is reinforced by our concern that we cannot foresee how different interpretation of the Act and Regulation, linking timeliness of an appeal to oral notice of a decision, would affect how the BZA functions in future cases. *See Skelly Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667, 674–79, 70 S.Ct. 876, 880–83, 94 L.Ed. 1194 (1950).[14]

■ Given that calculation of the timeliness of CAG's appeal began with the January 6 Fahey letter, the Board reasonably concluded that the appeal two months later was timely. *See Keating v. Zoning Board of Appeals*, 325 A.2d 521, 524–25 & n.5 (Me.1974) (60 days is a reasonable appeal period). We cannot hold this conclusion "arbitrary, capricious, an abuse of discre-

---

*Ehrenberg v. Persons*, 8 A.D.2d 18, 21, 185 N.Y.S.2d 369, 372 (App.Div.1959) (per curiam); 3 A. Rathkopf, *supra* § 37.04, at 37–53 to -54.

**13.** *Cf. People's Counsel v. Public Serv. Comm'n*, D.C.App., 414 A.2d 520 (1980) (per curiam). There we held that the time for filing an appeal from a decision of the Public Service Commission runs from the release of the printed copy of the decision rather than from a verbal announcement at a "sunshine hearing." *Id.* at 521. In *People's Counsel*, the Commission had offered no interpretation of the statu-

tory terms at issue, leaving the question to this court in the first instance. *Id.* In that case, we accordingly were required to construe a statute, performing a task more appropriate to a court than an agency, and our construction did not interrupt the prior practice of the agency.

**14.** We should not be understood, however, to hold that the BZA *must* interpret timeliness by reference to a written decision within the Department of Housing and Community Development.

tion, or otherwise not in accordance with law." D.C.Code 1978 Supp., § 1–1510(3)(A). We conclude that the Board had jurisdiction.

## III.

Goto claims that the Board is estopped from enforcing the Zoning Regulations against her because she relied to her detriment on the assurances of District officials that the kiln could be constructed without a permit. She also contends that the claim of Gottesman and CAG is barred by laches because they waited to appeal until after she had undertaken significant work on the kiln. Although the courts disfavor the affirmative defenses of estoppel and laches because of the public interest in enforcement of the zoning scheme, see *Wieck v. District of Columbia Board of Zoning Adjustment*, D.C.App., 383 A.2d 7, 10 .(1978) (citing cases), we conclude that the appeal was barred by laches in this case.[15]

■ Laches will bar the claim of Gottesman and CAG if they delayed unreasonably in bringing their appeal to the Board, to Goto's prejudice.[16] "The principal element in applying the doctrine of laches is the resulting prejudice to the defendant, rather than the delay itself." 4 A. Rathkopf, *supra* at 67–12 (1967) (footnote omitted). See generally *American University Park Citizens Association v. Burka*, D.C.App., 400 A.2d 737, 740 (1979); *Wieck, supra* at 11.

■ We look, first, to the record before the Board as to the timing of the claim in order to determine whether there was any unreasonable delay. Goto began work on the kiln in November 1974; Gottesman and Hinton learned by June 1975 that Dripps had decided no permit was necessary. During that seven-month period, Gottesman and CAG were working within the administrative process to attempt to prevent construction of the kiln; that delay is reasonable and cannot be held against them. See *Larkin v. Tsavaris*, 85 So.2d 731, 733 (Fla. 1956); *Morris v. Borough of Haledon*, 24 N.J.Super. 171, 178, 93 A.2d 781, 784 (Super. Ct.App.Div.1952).

The critical period was from June 1975 to March 1976. Hinton and Gottesman were aware of Dripps' ruling by June 1975. The record reveals no reason why they waited until November 1975 to discuss that decision with Dripps. That unexcused delay of five months was compounded by an addi-

15. The same elements of prejudice cited by Goto to support her laches defense give weight to her argument that the District is estopped from reversing its agents' earlier decision that a permit is not required. In order to establish a defense of equitable estoppel, Goto would be required to prove that (1) acting in good faith, (2) on affirmative acts of the District, (3) she made expensive and permanent improvements in reliance, and (4) the equities are strongly in her favor. See *Wieck, supra* at 11; *District of Columbia v. Cahill*, 60 App.D.C. 342, 343, 54 F.2d 453, 454 (1931).

Goto arguably has met all these requirements. Her estoppel claim presents a problem, however. It is not clear that estoppel will bar a case brought by a neighboring landowner; arguably, that defense may be asserted only against the municipality which rendered the decision on which a party relied. See *Wright v. DeFatta*, 129 So.2d 614, 619 (La.Ct.App. 1961); *Lichte v. Heidlage*, 536 S.W.2d 898, 901 (Mo.Ct.App.1976). The District itself did not become involved in enforcing Zoning Regulations against Goto until after the BZA proceedings, *i. e.*, until the BZA rendered a decision adverse to Goto which became the official position of the District. The estoppel defense thus

may not have been available to Goto until the proceedings in this court, in which she could argue that the BZA could not compel her to observe zoning requirements that other agents of the District were estopped to enforce.

Given our conclusion that laches barred the appeal, we need not resolve these issues.

16. Laches presents a question distinct from that of the timeliness of CAG's appeal, discussed in Part II.C., *supra*. In deciding that jurisdictional question, we look only to the period from the zoning official's decision to the filing of the appeal. See Supplemental Rules of Practice and Procedure Before the Board of Zoning Adjustment, 22 DCRR § 2.21 (1972); note 11 *supra*. In contrast, to determine the validity of a laches defense, we look to the entire course of events. See, e. g., *American Univ. Park Citizens Ass'n v. Burka*, D.C.App., 400 A.2d 737, 740–45 (1979); *Wieck, supra* at 11–13. Moreover, laches may bar consideration of an appeal which, for jurisdictional purposes, would be timely, just as laches may bar an equitable claim brought within an applicable statute of limitations. See *Amidon v. Amidon*, D.C.App., 280 A.2d 82, 84 (1971).

tional two months during which they requested (the record does not show when) and received a written decision. There is no record indication that bureaucratic delay was responsible for the two-month lag between the meeting on November 18, 1975, and the written decision of January 6, 1976. Finally, the delay of still another two months between that letter decision and the filing of the appeal on March 4, 1976, adds to the unreasonableness of the timing of CAG's action. Accordingly, although we have held that the appeal was timely filed, see Part II.C. *supra*, we cannot agree with the Board's conclusion that "the appellants have diligently objected to the kiln ...." During the nine months between their discovery of Dripps' decision and the filing of the appeal, Gottesman and CAG had knowledge of their rights and an opportunity promptly to assert them.

The second element of the laches equation is prejudice to Goto resulting from the delay. See *American University Park Citizens Association, supra* at 740. As the Board itself found, Goto spent approximately $2,000 of the $5,000 to build the kiln after Osborg, see note 2 *supra*, told her in April 1975 that no permit was required. She also expended time and money seeking a natural gas hookup at a hearing before the Public Service Commission. See note 3 *supra*. Essentially, therefore, the neighbors stood by and watched Goto spend time and money months before pressing their objections before the BZA.

Under similar circumstances, courts in other jurisdictions have concluded that equity requires the barring of a claim. In *Hill v. Board of Adjustment*, 122 N.J.Super. 156, 299 A.2d 737 (Super.Ct.App.Div.1972), for example, homeowners relied on a building inspector's grant of a permit to build a garage. *Id.* at 158, 299 A.2d at 738. The homeowners began construction and had spent $3,500 of an estimated cost of $6,000 when, four months later, neighbors alerted the building inspector that the garage construction violated the side-yard requirement. *Id.* at 159, 299 A.2d at 738. The Board of Adjustment granted a variance to the homeowners. *Id.* The court held that

the neighbors' appeal was barred by estoppel and laches. *Id.* at 162–63, 299 A.2d at 740–41. Similar, and occasionally even shorter, delays have been held to bar claims in light of a party's reliance on a zoning official's decision, to his or her prejudice. See *Medical Arts, Inc. v. Rohrbaugh*, 293 So.2d 366, 369 (Fla.Dist.Ct.App.1974) (laches bars appellee-neighbors' suit filed three months after issuance of building permit and two months after complaint to City Council when appellant had spent considerable sums on construction before suit filed); *Black v. Barnes*, 215 Ga. 827, 829, 114 S.E.2d 38, 39 (1960) (laches bar plaintiff-neighbor's suit filed three months after commencement of construction when defendant had undertaken substantial building activity and financial commitment); *Oeth v. Felty*, 421 S.W.2d 860, 860–62 (Ky.1967) (laches bars plaintiff-neighbors' suit filed six months after issuance of permit to erect television transmission tower when neighbor moved for rehearing only after tower partially built and filed suit only after tower completed); *Maroney v. Friere*, 74 Misc.2d 339, 341, 343 N.Y.S.2d 183, 185 (Sup. Ct.1973) (laches bars petitioner-neighbors' suit filed four months after issuance of building permit when respondents had entered into building contract in interim).

Goto's actions in reliance on the assurances of zoning officials were reasonable, in contrast with the unexplained delays by her neighbors in instituting an appeal, to Goto's substantial prejudice.

IV.

We conclude that the Board had jurisdiction over this appeal. Nonetheless, the Board's conclusion that Gottesman's and CAG's claim was not barred by laches was "unsupported by substantial evidence in the record of the proceedings before the court." D.C.Code 1978 Supp., § 1–1510(3)(E). We therefore set aside the BZA's order reversing the decision of the Zoning Administrator dated January 6, 1976.

*So ordered.*

KELLY, Associate Judge, concurring in part and dissenting in part:

I agree with the majority opinion's holding as to laches but would reverse for lack of jurisdiction in the Board.

The Board's final order in this case held that petitioner's kiln was a "building" and a "building addition" under § 1202 of the Regulations, and not an "accessory structure" which would have automatically been permitted within the C–1 zone.[1] Variances from the floor area ratio, rear yard and open court requirements were thus necessary.

The Board found merit neither in petitioner's argument that the BZA was estopped by petitioner's good faith detrimental reliance on the actions of the District of Columbia officials nor in her contention that the defense of laches barred the CAG from bringing its appeal.[2]

The BZA also found that the CAG had standing before it as a "person aggrieved" within the meaning of the Zoning Regulations, § 8102, and as an "appellant" alleging error under § 8206.

In reviewing the BZA's decision, or the decision of any administrative agency with quasi-judicial powers, this court must, before reaching the standards of review set forth in § 1–1510 of the District of Columbia Administrative Procedure Act, make two threshold determinations. First, as any court, it must ascertain the adequacy of its own jurisdiction. *Reid v. United States,* 211 U.S. 529, 29 S.Ct. 171, 53 L.Ed. 313 (1909); *Minnesota v. Hitchcock,* 185 U.S.

---

1. The Board interpreted the term "building," defined as a "structure having a roof supported by columns or walls for the shelter, support or enclosure of persons, animals, or chattel" in § 1202 of the Zoning Regulations, to include the kiln. It rejected petitioner's argument that a kiln is *not* for sheltering, supporting, or enclosing pots but for *firing,* or "cooking" them, and that it is thus most comparable to a backyard barbecue. The Board also found that the gas pipes running from the main building to the kiln constituted such "communication" between them as to make them one building, despite the following language in the Regulations: "The existence of communication between separate portions of a structure below the main floor shall not be construed as making such structure one building" (§ 1202) and despite the absence of any statutory or case law referring to pipes or plumbing as a means of "communication" between buildings. ("Communication" normally appears to be used as an equivalent term for "access.") In my judgment, the Board's interpretation of the terms "building" and "communication" are not only contrary to common sense but also plainly erroneous and inconsistent with the Zoning Regulations. *See Dietrich v. District of Columbia Board of Zoning Adjustment,* D.C.App., 320 A.2d 282, 286 (1974).

2. I note in passing that the Board's conclusions and findings of fact seem insufficient to defeat what the Board itself seems to concede is a prima face case of estoppel against the municipality, which is a cognizable defense to Zoning Board jurisdiction in the District of Columbia. *See Wieck v. District of Columbia Board of Zoning Adjustment,* D.C.App., 383 A.2d 7 (1978); *District of Columbia v. Stewart,* D.C. App., 278 A.2d 117 (1971); *District of Columbia v. Cahill,* 60 App.D.C. 342, 54 F.2d 453

(1931); and *see Smith v. District of Columbia Board of Zoning Adjustment,* D.C.App., 342 A.2d 356 (1975).

> The Board concluded that
> Ms. Goto did indeed receive the approval of the government of the District of Columbia to construct the kiln.
> And that
> The total cost of building the kiln was approximately $5,000, of that total cost, approximately $2,000 was expended after Ms. Goto received an indication from the permit authorities in April of 1975 that no permit was required.

Unless the Board found, as it did not, that petitioner's reliance was insufficiently detrimental or not reasonable and in good faith, or that the balance of equities does not favor the petitioner here, it would be difficult to affirm the Board's conclusion that estoppel was an insufficient defense. *See Wieck v. District of Columbia Board of Zoning Adjustment, supra* at 11:

> The necessary elements [of estoppel] are: a party (1) acting in good faith, (2) on affirmative acts of a municipal corporation, (3) makes expensive and permanent improvements in reliance thereon, and (4) the equities strongly favor the party invoking the doctrine.... Furthermore, the reliance of the party must be justifiable.... [Citations omitted.]

And *see Smith v. District of Columbia Board of Zoning Adjustment, supra* at 359:

> [T]he Board must make findings as to (a) whether there was reasonable and good faith reliance by petitioners ... and (b) the extent to which they were on notice that the [structure] might violate the Zoning Regulations.

373, 22 S.Ct. 650, 46 L.Ed. 954 (1902). Second, almost as a conceptual prerequisite to its own exercise of jurisdiction, it must assure itself that there was a proper assertion of jurisdiction by the agency (or court) below. Normally, this court is bound by the BZA's interpretation of its own regulations unless it is plainly erroneous or inconsistent with the Regulations. *Dietrich v. District of Columbia Board of Zoning Adjustment*, D.C.App., 320 A.2d 282, 286 (1974). However, an agency's faulty interpretation of its governing jurisdictional regulations can never be harmless error. Our inherent judicial authority in matters of statutory construction requires us to consider *de novo* the propriety of an agency's exercise of jurisdictional power under its statutory grant of authority. Furthermore, this inquiry needs no prompting; it must be done by this court sua sponte.[3] Although a presumption of regularity attaches to jurisdictional questions, it may be disproved by extrinsic evidence or by the record itself. *Pardo v. Wilson Line of Washington, Inc.*, 134 U.S. App.D.C. 249, 252, 414 F.2d 1145, 1148 (1969).

The crucial jurisdictional question before us, in my opinion, is whether the CAG, appellant below, had proper standing to come before the Board and contest the Zoning Administrator's January 6, 1976, decision in Miss Goto's favor.[4] I recognize that over the years CAG has brought many important cases in the interest of its members, but this is the first time this point has been squarely presented.

The Board's jurisdiction is set forth in D.C.Code 1973, § 5–420, which codifies section 8, chapter 534 of the congressional Act of June 20, 1938.[5] The Act empowers the Zoning Commission to adopt Zoning Regulations pursuant to it and also give the BZA the power to "make special exceptions" and "pass upon disputed questions ... as they arise in the administration of the Regulations." It then sets forth the Board's jurisdiction to hear "appeals ... taken by any person aggrieved [etc.]" (the language is identical to § 8102 of the Regulations) and gives the Board four categories of powers "upon appeals": (1) to "hear and decide appeals where it is alleged by any appellant that there is error ..." (identical to § 8206),[6] (2) to hear and decide requests for special exceptions, (3) to grant hardship variances, and (4) to assume "all the powers of the officer or body from whom the ap-

---

**3.** Petitioner raised the issue of jurisdiction in her motion to dismiss, which was summarily denied before the first hearing began. *See Smith v. District of Columbia Board of Zoning Adjustment, supra* at 359 n.8, where we suggested that defenses to an agency's exercise of jurisdiction be heard before proceeding to the merits, "in the interest of judicial economy, [so] that this court [need] not be compelled to reach the merits ... if petitioners will prevail in their defense ...." The jurisdictional question was raised there, as here, in a motion to dismiss, but there based solely on the defenses of estoppel and laches.

**4.** The name of Mr. Gottesman, intervenor both here and before the BZA, does not appear anywhere on the March 4, 1976, appeal form. He was not granted leave to intervene on the side of the CAG until July 21, 1976, the day of the first BZA hearing. There is nothing in the record that argues that his relationship to the CAG is the basis for the CAG's appeal.

**5.** The 1938 Act is found in Pub.L. No. 684, 52 Stat. 797.

**6.** "Appeals from Administrative Decisions," § 8102, says, in pertinent part:

The Zoning Act of June 20, 1938 (52 Stat. 797), as amended, provides that appeals to the Board of Zoning Adjustment may be taken by any person aggrieved, or organization authorized to represent such person ... by any decision of an administrative officer ... or any other administrative decision based in whole or part upon any zoning regulations or zoning maps....

Under § 8026, the Board

shall hear and decide appeals where it is alleged by the appellant that there is error in any order, requirement, decision, determination or refusal made by any administrative officer or body ... in the administration or enforcement of these regulations.

At the first BZA hearing on this action, Board Member Cummings could not distinguish the two provisions. She complained, "There are two sections under which one could appeal and I could never get them straight and I could never understand why there were two sections."

peal is taken" necessary to "exercise the above mentioned powers." [7]

The Act sets forth two cumulative (not alternative) requirements for appeals to the BZA: first, a showing of aggrievement, and, second, either invoking the Board's original jurisdiction under §§ 8207.11 or 8207.2 or its appellate jurisdiction under § 8206 by "alleging error" in an administrative order, etc. Thus, all applicants to the Board's jurisdiction, whether original or appellate, must include a § 8102 showing that they are aggrieved.

Presuming that the CAG is technically an "organization," rather than a "person" under § 8102, it bears the additional burden of showing that it is "authorized to represent [an aggrieved] person." There is nothing in the record before us to support such a finding.

Even assuming that the CAG is a "person," the CAG, and the BZA in its ultimate conclusions, made no adequate showing that it was an "aggrieved" one.[8] Given the apparent confusion regarding the interpretation of the term "aggrieved person" within the Zoning Regulations, I briefly examine its provenance and use in this jurisdiction and its application (particularly to neighborhood associations) in zoning board of appeals cases elsewhere.

The term "aggrieved person" is not unfamiliar language in the District of Columbia. It is used to demarcate the standing required for judicial review of agency action in both the District of Columbia Administrative Procedure Act [DCAPA] [9] and in the analogous provision in the Federal Act.[10]

In *Basiliko v. Government of the District of Columbia*, D.C.App., 283 A.2d 816, 818 (1971), this court first construed the "aggrieved person" language in the DCAPA, adopting a three-part standing test that required a showing of injury in fact, caused by agency action which was arbitrary, capricious, or in excess of statutory authority, and within the zone of interests to be protected by the statute.[11]

The underlying concern in limiting standing is generally "that the questions ... be framed with the necessary specificity, that the issues ... be contested with the necessary adverseness and that the litigation ... be pursued with the necessary vigor ...." *Flast v. Cohen*, 392 U.S. 83, 106, 88 S.Ct. 1942, 1955, 20 L.Ed.2d 947 (1968).

"The question of standing depends primarily upon the existence of a logical and adequately direct nexus between the plaintiff's interests and the adverse action of the opposing party or parties." *Citizens Association of Georgetown v. Simonson*, 131 U.S. App.D.C. 152, 153, 403 F.2d 175, 176 (1968), *cert. denied sub nom. 3259 M Street, Inc. v. Citizens Association of Georgetown*, 394 U.S. 975, 89 S.Ct. 1454, 22 L.Ed.2d 755 (1969).

---

7. The BZA's powers under (2) and (3) were codified in the Regulations under §§ 8207.11 and 8207.2 ("Original Jurisdiction"), while (4) was codified in § 8208 ("Administrative Powers").

8. The Board found that "[T]he Citizens Association of Georgetown is a neighborhood citizens' association composed of many residents of the area, including the immediate vicinity of the site which is the subject of this appeal. The Association has often appeared before both the Board of Zoning Adjustment and the Zoning Commission to represent the views of its members on zoning issues and to protect its community from negative influences." There was no evidence in the record to support these findings, which appear to be based entirely upon facts of which the Board took administrative notice. Aside from the propriety of adopting the CAG's self-depiction as a fighter against "negative influences," I question its unsupported finding that the CAG has members residing in the immediate vicinity and, if there are such members nearby that it is authorized to represent their interests.

9. D.C.Code 1978 Supp., § 1–1510.

10. 5 U.S.C. § 702 (1970).

11. *See Ballerina Pen Co. v. Kunzig*, 140 U.S. App.D.C. 98, 101, 433 F.2d 1204, 1207 (1970), *cert. denied sub nom. National Industries for Blind v. Ballerina Pen Co.*, 401 U.S. 950, 91 S.Ct. 1186, 28 L.Ed.2d 234 (1971) (citing the test in the 1970 Supreme Court companion cases, *Barlow v. Collins*, 397 U.S. 159, 164–65, 90 S.Ct. 832, 836, 25 L.Ed.2d 192 (1970), and *Association of Data Processing Service Associations v. Camp*, 397 U.S. 150, 153–55, 90 S.Ct. 827, 829–30, 25 L.Ed.2d 184 (1970)).

Standing restrictions are generally devised "not so much [out of] fear of a plethora of parties in interest as [out of] apprehension that standing might be abused by a person with no *legitimate* interest in the proceedings but with a desire only to delay the [agency action] for some private selfish reason." *Office of Communication of United Church of Christ v. FCC*, 123 U.S.App. D.C. 328, 335, 359 F.2d 994, 1001 (1966) (emphasis in original). And see legislative history cited, *id.* at 335 n.12, 359 F.2d at 1001 n.12.

Since the "aggrieved person" language that Congress employed in the District of Columbia Zoning Regulations, § 8102, cannot, under any canons of statutory construction, be treated as surplusage or as adventitious terminology, especially given the established history of the term in federal law, the question becomes how to apply the term in Board of Zoning Adjustment cases. Since there has been no automatic "aggrieved person" standing statutorily granted to citizens associations in these cases,[12] I look to the use of the term elsewhere, as it applies to organizations and as used in zoning appeals.

"A mere 'interest in a problem,' no matter how long standing the interest and no matter how qualified the organization is in evaluating the problem, is not sufficient itself to render an organization 'adversely affected' or 'aggrieved' within the meaning of the APA [5 U.S.C. § 702]." *Sierra Club v. Morton*, 405 U.S. 727, 739, 92 S.Ct. 1361, 1368, 31 L.Ed.2d 636 (1972) (quoted in *United States v. Richardson*, 418 U.S. 166, 177, 94 S.Ct. 2940, 2946, 41 L.Ed.2d 678 (1974)).

In zoning review cases, where aggrieved person language is frequently employed,[13] the test is generally whether the applicant for relief "show[s] a sufficient interest in the subject matter of the application that he will actually be injured by the governmental action. . . . The rule that one without some right, title or interest in property cannot apply for relief, rests on the theory that hardship . . . cannot be incurred by a person who is without some valid attachment to the land to which the application relates. Rohan, Zoning and Land Use Controls § 51.02[1] (1979). "In a sense, every citizen of the community has a stake in the disposition of each zoning dispute, and may be 'aggrieved' by administrative decisions which he regards as erroneous. But it seems unlikely that the draftsmen . . . could have intended to give standing to such a broad class of persons." Anderson, American Law of Zoning § 21.06 (1968). *See also* 3 A. Rathkopf, Law of Zoning and Planning § 37.03 (4th ed. 1979).

The cases generally require a "specific, personal and legal interest," *Krejpcio v. Zoning Board of Appeals*, 152 Conn. 657, 659, 211 A.2d 687, 689 (1965), and, more than a general interest in the viability of the community zoning plan, "a pecuniary interest injuriously affected." *Tyler v. Board of Zoning Appeals*, 145 Conn. 655, 659, 145 A.2d 832, 835 (1958). One test is the person's " 'direct', 'immediate', 'pecuniary' and 'substantial' interest in the subject matter of the litigation . . . ." *Baker v. Zoning Hearing Board of West Goshen Township*, 27 Pa.Cmwlth. 602, 607, 367 A.2d 819, 822 (1976).

Property owners' associations cannot be characterized as "aggrieved" unless they

---

12. *Compare Citizens Association of Georgetown v. Simonson, supra* at 153, 403 F.2d at 176, where Congress explicitly *directed* the Alcoholic Beverage Control Board to consider "the wishes of the persons residing or owning property in the neighborhood" in issuing liquor licenses. *Simonson* also involved the CAG, which there, unlike here, alleged *in its complaint* "that many of its members reside or own property within the neighborhood" and was shown to be "an authorized spokesman organized to promote [the neighbors'] interests for its individual members." *Id.* Nor was *Simon-*

son a case construing "aggrieved person" terminology. *Cf. Kopff v. District of Columbia Alcoholic Beverage Control Board*, D.C.App., 381 A.2d 1372, 1376- 77 (1977) (Advisory Neighborhood Commission members have individual standing as area residents to seek court review of ANC's statutorily granted rights).

13. Most state enabling statutes have been modeled after the Standard State Zoning Enabling Act of 1926 which provides for appeals to the zoning board "by any person aggrieved" (§ 7).

"successfully demonstrate[ ] that those whom [they] represent have a significant interest in the matter." Rohan, *supra* at § 51.02[2]. *See Vitolo v. Chave*, 63 Misc.2d 971, 314 N.Y.S.2d 51 (1970); Rathkopf, *supra* at § 37.03[5], and *see* Anderson, *supra* at §§ 21.05 to 21.10. A property owners' association that does not own land affected by a [zoning] board decision is not a person aggrieved by such a decision. *Lido Beach Civic Association v. Board of Zoning Appeals*, 13 App.Div.2d 1080, 217 N.Y.S.2d 364 (1961); *accord, Stocksdale v. Barnard*, 239 Md. 541, 544, 212 A.2d 282, 284 (1965) ("an appeal is not authorized by an association as a party aggrieved [even] by reason of its members being aggrieved").

In light of the general consensus in federal law and in zoning appeals cases that "aggrieved" organizations must represent their members' concrete interests in a contested administrative decision, and in view of the specific language in § 8102 of our Regulations that these appeals be made by an "organization *authorized to represent [an aggrieved]* person," and the lack of any per se standing exemptions in the regulations for citizens groups such as the CAG,[14] I would hold that the BZA must, before asserting jurisdiction, establish both "the existence of a logical and adequately direct nexus," *Citizens Association of Georgetown v. Simonson, supra* at 153, 403 F.2d at 176, between the interests of its members and the administrative decision it is contesting, and its own authority to represent those interests. Furthermore, these "interests" must be specific and significant, viewed under the standards we enumerated in *Basiliko v. Government of the District of Columbia, supra* at 818.

The record before us is devoid of anything but vague, generalized assertions of injury. When asked on the BZA's application form for appeals to "state manner in which *appellant* is aggrieved by administrative decision," the CAG answered: "Decision permits the erection of addition to (or accessory to) non-conforming building with substandard rear yard, thereby increasing congestion and density of development in Georgetown Historic District." Asked to "state briefly the allegations of error in administrative decision," the CAG said: "Decision improperly relieves owner of F.A.R. [floor area ratio] and rear yard requirements in the C–1 Zone and allows a rear addition to a non-conforming structure reducing depth of rear yard .... Also permits unauthorized use in C–1 Zone, i. e., fabrication of ceramics."

Neither answer is adequate. Not only is the logical nexus between the backyard kiln in question and "increasing congestion and density of development" unexplained, the relationship of the CAG to the "Georgetown Historic District" designation is not mentioned, nor is there any allegation that CAG members live in the area of petitioner's kiln or are affected in any way by its construction.

I do not believe such an application is sufficient to establish aggrievement under § 8102. Nor could the inadequacy of the application information have been cured by the record before the Board.[15]

Although the Board says, in its final order, that "to accept the position [on standing] advanced by Miss Goto would be to effectively negate the appeals process," I disagree. The appeal procedure under §§ 8102 and 8206 need not necessarily bar cases such as this. On the contrary, establishing proper standing before the onset of

14. D.C.Code 1973, § 5–420 exempts citizens associations "created for civic purposes and not for profit" only from paying the filing fee required in appeals to the BZA.

15. The only neighbors, other than Mr. Gottesman, who appear in the record are the twelve who submitted letters to the Board in support of petitioner. They all say she was a good neighbor and that they did not believe her studio or the kiln was harmful. Her next door neighbor, in fact, said, "The shop in no way is offensive to me or to anyone else, in fact, it is an asset to the block. I see no reason why it should not be allowed to remain in business." Another neighbor said, "We have come to regard this studio as one of the valued cultural institutions of our neighborhood. We would be sorry to see Ms. Goto unable to continue with her fine neighborhood cultural service."

a BZA hearing will ensure that the questions before the Board are "framed with the necessary specificity ... contested with the necessary adverseness, and pursued with the necessary vigor." *Flast v. Cohen, supra* at 106. Although Congress could have extended automatic standing to groups that seek to represent the public interest, such as the CAG, it did not, and this court may not.

There is no factual support in the record for establishing standing for Gottesman. He filed no complaint; he testified for CAG at the July 21, 1976 hearing and orally moved to intervene as a party at the *end* of the hearing. His objections to the kiln are general and unrelated to any injury to him. The Board made no finding that Gottesman was a "person aggrieved;" he was allowed to intervene because "he was the man next door." I would not confer automatic standing upon an adjoining property owner without some allegation of injury to that specific property. Courts have frequently denied standing to adjoining property owners who failed to make a sufficient showing of special or pecuniary damages. *See, e. g., Stephens v. Tate*, 147 Ga.App. 366, 249 S.E.2d 92 (1978); *Waltham Motor Inn, Inc. v. La-Cava*, 3 Mass.App. 210, 326 N.E.2d 348 (1975); *Housing Authority of the City of Melbourne v. Richardson*, 196 So.2d 489 (Fla.Dist.Ct.App.1967); *Kalvatis v. Village of Port Chester*, 235 N.Y.S.2d 44 (1962). *See also Western Michigan University Board of Trustees v. Brink*, 81 Mich.App. 99, 102 n.1, 265 N.W.2d 56, 58 n.1 (1978) ("If adjoining landowners could suffer special damages, then they can easily plead them.")

Since the CAG did not establish its standing [16] as required under the Zoning Regulations, I would hold the Board's denial of petitioner's motion to dismiss for lack of jurisdiction was plainly erroneous.

---

16. *See DeLevay v. District of Columbia Rental Accommodations Commission*, D.C.App., 411 A.2d 354 (1980), for a recent discussion of standing to bring an appeal to the RAC pursuant to RAC Regs. § 5.30 (an interpretation of the "aggrieved party" language in the Rental Accommodations Act, D.C.Code 1978 Supp., § 45–1652(g).