BANNUM, INC., Petitioner

v.

DISTRICT OF COLUMBIA BOARD
OF ZONING ADJUSTMENT,
Respondent

Regina James, Member, Advisory
Neighborhood Commission
5–B, Intervenor.

No. 04–AA–345.

District of Columbia Court of Appeals.

Argued Oct. 20, 2005.

Decided March 16, 2006.

Michael A. Gordon, with whom Shawn C. Whittaker, Donald C. Holmes, and John D. Rich were on the brief, for petitioner.

Mary T. Connelly, Assistant Attorney General for the District of Columbia, with whom Robert J. Spagnoletti, Attorney General, and Edward E. Schwab, Deputy Attorney General, were on the brief, for respondent.

Donald M. Temple for intervenor.

Before FARRELL and REID, Associate Judges, and TERRY, Senior Judge.*

TERRY, Senior Judge:

Petitioner Bannum, Inc., seeks review of an order of the Board of Zoning Adjustment ("BZA" or "the Board") which revoked a pair of building permits previously issued by the Department of Consumer and Regulatory Affairs ("DCRA"). Those permits, had they remained in effect, would have allowed Bannum to operate a community correctional center ("CCC") in the District of Columbia. Bannum's principal contention is that the BZA incorrectly interpreted the zoning regulation under which the DCRA had granted the building permits when it ruled that the specific nature and duration of the CCC made it neither "temporary" nor a "correctional institution." This regulation, 11 DCMR § 801.7(k) (2003), provides that a building permit for a "[t]emporary detention or correctional institution on leased property for a period not to exceed three (3) years" is "permitted as a matter of right in a C–M [Commercial and Light Manufacturing] District." Bannum also launches a barrage of other attacks on the decision of the BZA, including claims of laches, estoppel, lack of standing, untimely appeal, federal

pre-emption, and denial of equal protection of the laws. We are unpersuaded by any of Bannum's arguments, and thus we affirm the BZA's decision.

I

The federal Bureau of Prisons ("BOP") issued a request for proposals ("RFP") to build and operate a CCC in the District of Columbia. The RFP described the proposed CCC as a "halfway house" and a "penal or correctional facility." In response to the RFP, Bannum searched for potential locations for the CCC and found a warehouse on Adams Place, N.E. Bannum then sent letters to the District's Mayor, Police Chief, and Ward 5 Councilman Vincent Orange [1] recommending that the warehouse be converted into a CCC. In those letters, Bannum stated that "the proposed site will be able to accommodate up to two hundred and sixty offenders" and that "[t]he total term of the proposed contract is five years." The letters also outlined the three methods by which a federal offender is admitted to a CCC. Most choose to be transferred from prison for pre-release confinement to complete the last twenty percent of their sentence; some are committed directly to the CCC to serve short sentences; and some others, under the supervision of the Probation Office, are made residents of the CCC as a condition of probation. The letters concluded by describing how the CCC would be operated on a day-to-day basis: a staff of ten (including some social workers) would help CCC inmates find jobs and housing during their stay there, which would typically last three or four months.

---

* Judge Terry was an Associate Judge of the court at the time of argument. His status changed to Senior Judge on February 1, 2006.

1. The warehouse is located in Ward 5.

The facility would have no locks, bars, secure perimeters, or armed guards.

In a letter to the DCRA, Bannum identified itself as a contractor specializing in "provid[ing] residential rehabilitation services to individuals referred by appropriate committing authorities" through BOP contracts, which direct Bannum to construct and operate community correctional centers. Bannum did not mention, nor did the DCRA request, any other details regarding the nature of the CCC or how long it would be in operation. The letter quoted the language of 11 DCMR § 801.7(k)[2] and immediately thereafter asserted that the CCC could operate as a matter of right in its proposed location. Although no facility has ever been authorized in the District of Columbia pursuant to section 801.7(k), Bannum's letter requested the DCRA's concurrence with its interpretation of that regulation.

The Zoning Administrator signed off on the dotted line on the same sheet of paper[3] and mailed it back to Bannum the same day (*i.e.*, the DCRA did not reply on its own letterhead or give reasons why concurrence was justified). Several months later, Bannum sent another "concurrence letter" to the DCRA (virtually identical to the first letter), and the Zoning Administrator again signed off on it. It appears that neither concurrence letter included copies of the RFP, nor did either letter recite the details about the CCC that were set forth in the letters to other District officials regarding the lack of bars, guards, or locks, or mention that the proposed CCC could hold up to 260 residents.

Councilman Orange sent a letter to the BOP opposing the award of a contract because, in his words, "Ward 5 already has more community correction facilities than any other ward in the District of Columbia." Nevertheless, despite this letter, Bannum entered into a lease for the property on Adams Place. The initial term of the lease was for two years, but it included three additional one-year options, which meant that the lease could potentially have lasted for five years.

The DCRA issued to Bannum a building permit to construct and operate a "150 bed community corrections center." About a month later, it issued a revised permit authorizing the construction of a "temporary 150 bed community corrections center on leased property for a period not to exceed three (3) years." Bannum's application for this permit stated only that it was for alteration and repair to "change tenant warehouse to 150–bed community corrections center," without any further description of the nature of the CCC. The application did not cite section 801.7(k). At the time it issued the two building permits, the DCRA had not seen Bannum's lease for the warehouse, the contract with the BOP, or the RFP issued by the BOP. The DCRA did not request any information to verify that the CCC could legally operate in this C–M zone before issuing either permit.

2. 11 DCMR § 801.7 provides, in pertinent part:

 The following additional uses shall be permitted as a matter of right, subject to the standards of external effects in § 804:

 \* \* \* \* \* \*

 (k) Temporary detention or correctional institution on leased property for a period not to exceed three (3) years . . . .

3. The Office of the Zoning Administrator is part of the DCRA.

The chairperson of Advisory Neighborhood Commission ("ANC") 5–B, as intervenor, appealed to the BZA from the DCRA's issuance of both the original building permit and the revised building permit. The BZA held a hearing on the ANC's appeal, which extended over five days in the spring and summer of 2003. At that hearing the BZA heard testimony from, among others, officials from the Zoning Administration and ANC 5–B, as well as several of Bannum's officers. Regarding the nature of the CCC, the BZA found that inmates may leave daily to go to work, and that with appropriate behavior, inmates may receive a pass to leave the CCC for other reasons and for an entire weekend. If inmates leave without permission, the BZA found, the CCC staff "cannot and will not stop them."

The BZA ruled as a matter of law that Bannum's CCC was not a "temporary detention or correctional institution." In discussing the duration of the CCC operations, the BZA concluded that the CCC did not constitute a "temporary" use under section 801.7(k). In addition, it ruled that the BOP contract, the lease, and the testifying witnesses showed that both the contract and the lease could potentially last more than three years. The BZA then analyzed "the nature of the use" of Bannum's proposed CCC and found that the term "detention or correctional institution" did not encompass what Bannum intended to do with it. In particular, the BZA noted that the facility would be unsecured, and that it was not designed to handle a temporary overflow from the District of Columbia Jail, which was the specific problem that section 801.7(k) was intended to ameliorate, according to its legislative history.[4]

The BZA also rejected Bannum's other claims regarding timeliness, standing, authority to bring an appeal, estoppel, and laches. After the BZA denied both the DCRA's and Bannum's motions for reconsideration, Bannum filed the instant petition for review.

## II

We note at the outset that we are not called upon here to decide whether Bannum's CCC would ultimately succeed in curing criminal recidivism or improving the criminal justice machinery, or even whether the benefits sought to be provided by the CCC outweigh the goals of the District's zoning regulations. We consider only the narrow issue of whether the BZA reasonably concluded that the DCRA improperly granted Bannum a building permit under 11 DCMR § 801.7(k). We are satisfied that the BZA's decision is well founded in the record and that its interpretation of section 801.7(k) was reasonable, and accordingly we affirm that decision in all respects.

This court will uphold a decision of the BZA if its findings of fact are supported by substantial evidence, and if its legal conclusions are rationally based on those findings. *E.g., Watergate West, Inc. v. District of Columbia Board of Zoning Adjustment,* 815 A.2d 762, 765 (D.C.2003); *Draude v. District of Columbia Board of*

---

4. The BZA also determined that Bannum's proposed CCC was not a community-based residential facility ("CBRF") because the CCC would have the capacity to house more than 200 inmates, whereas CBRFs were intended to be much smaller, family-type residences. Although the language of the regulation does not mention numerical limits on capacity, the BZA based this part of its decision on the legislative history of 11 DCMR § 199.1. ANC 5–B contests the BZA's conclusion on this issue. However, since we hold on other grounds that the BZA's decision must be affirmed, and since Bannum does not challenge the BZA's ruling on this point, we need not decide it.

*Zoning Adjustment,* 582 A.2d 949, 953 (D.C.1990). An agency's interpretation of a statute that it administers will stand unless that interpretation, considered in light of the statute's language and legislative history, is unreasonable. *Lincoln Hockey LLC v. District of Columbia Dep't of Employment Services,* 810 A.2d 862, 866 (D.C. 2002). Indeed, this court will grant "particular deference" to the BZA's interpretation of its own governing statute and regulations. *Watergate West,* 815 A.2d at 765; *Dupont Circle Citizens Ass'n v. District of Columbia Board of Zoning Adjustment,* 749 A.2d 1258, 1262 (D.C.2000).

Before considering the merits of Bannum's main claim, *i.e.,* before deciding whether the BZA's interpretation of section 801.7(k) was reasonable, we must first address Bannum's raft of preliminary arguments, raising issues of timeliness, standing and authority to bring an appeal, estoppel, laches, federal pre-emption, and equal protection.

### A. *The ANC's Standing to Appeal*

█ Bannum first contends that the BZA should not have entertained the ANC's appeal because ANC 5–B does not qualify as an "aggrieved" party. Bannum argues that "aggrieved" status requires that the appellant—in this case, Commissioner James, a member of ANC 5–B— show a greater injury than one that is suffered by the general public, and that ANC 5–B presented no evidence to support its claim of injury.[5]

█ D.C.Code § 6–641.07(f) (2001) provides:

Appeals to the Board of [Zoning] Adjustment may be taken by any person *aggrieved,* or any organization authorized to represent such person, or by any officer or *department of the government of the District of Columbia* or the federal government *affected,* by any decision ... granting or refusing a building permit or granting or withholding a certificate of occupancy, or any other administrative decision based in whole or in part upon any zoning regulation or map .... [Emphasis added.][6]

The BZA, referring to several documents in the record showing that Commissioner James was authorized to represent the ANC, concluded that the ANC had automatic standing because it was a "department of the District of Columbia government," and because it was "affected" by the decision to grant the building permit. The documentary and testimonial evidence from Ms. James and from Joan Black, acting chairperson of ANC 5–B, amply supported this conclusion by establishing that the CCC, if allowed to operate, would have a particularly negative effect on the community represented by the ANC. Moreover, 11 DCMR § 3199.1 states that "[t]he ANC for the area within which the property that is the subject of the appeal is located" is a party to any appeal to the Board from, *inter alia,* "any decision granting or refusing a building permit ...." *See* 11 DCMR § 3200.2. The BZA ruled that section 3199.1 thus grants "automatic" party status to any ANC "in any appeal involving property located within [its] area." This ruling, in our view, was

---

5. Bannum supports its argument on this issue with a citation to *Goto v. District of Columbia Board of Zoning Adjustment,* 423 A.2d 917, 923 (D.C.1980). That case is inapposite, however, because it did not involve an ANC, but rather a non-governmental citizens association. *See id.* at 918.

6. In addition, 11 DCMR § 3112.1 authorizes "any person aggrieved by an order [or] decision ... made by an administrative officer or body ... in the administration or enforcement of the Zoning Regulations" to appeal to the BZA.

entirely reasonable as an interpretation of section 3199.1.[7]

### B. Timeliness and Laches

Bannum next claims that the BZA never had jurisdiction to consider the ANC's appeal because it was untimely filed. All parties agree that the appeal of ANC 5–B to the BZA from the DCRA's issuance of the building permits was filed on January 24, 2003, well within sixty days from the date of issuance of both the original building permit (December 12, 2002) and the revised building permit (January 17, 2003).[8] However, Bannum argues that because ANC 5–B failed to appeal within sixty days from the issuance of the DCRA "concurrence letters," its claims should not have been heard. The BZA first considered whether such letters were appealable at all. It ruled that they were, concluding that they qualified as "other administrative decisions" under D.C.Code § 6–641.07(f).[9]

 We need not decide whether the concurrence letters were separately appealable (there are arguments to be made on both sides of that issue) because we agree with the BZA's further conclusion that the ANC's failure to appeal from a concurrence letter, "even after notice,[10] does not bar a subsequent appeal of the related building permit." Because the issuance of a building permit requires the DCRA to comply with the public notice and other requirements set forth in the zoning regulations, we hold that a party such as ANC 5–B may wait to appeal until the DCRA takes official action by issuing the permit, regardless of whether or not that party has appealed (or tried to appeal) from any earlier interlocutory "administrative decision." As the BZA explained, section 6–641.07(f) of the Code

> recognizes three types of appealable zoning-related decisions: (1) those granting or refusing building permits; (2) those granting or withholding certificates of occupancy; and (3) "other administrative decisions."

We agree with the BZA that each type of decision is separately appealable.

 Bannum also contends that, as a result of the ANC's nine-month "delay" in bringing an appeal, it incurred substantial costs in renovating the warehouse, and therefore the BZA should have dismissed the ANC's appeal on the ground of lach-

---

7. It is also consistent with D.C.Code § 6–641.07(f), quoted above in the text.

8. As amended in 2002, 11 DCMR § 3112.2(a) provides:

> An appeal shall be filed within sixty (60) days from the date the person appealing the administrative decision had notice or knowledge of the decision complained of, or reasonably should have had notice of knowledge of the decision complained of, whichever is earlier.

See 50 D.C. Register 1203 (February 7, 2003).

9. The BZA said, "There is no doubt that the two concurrence letters are decisions, but not decisions to grant a building permit." It then went on to find "persuasive reasons" why "separate appeals" from concurrence letters and building permits should be allowed.

10. It is by no means clear that the ANC had notice of the concurrence letters at the time they were issued. There is no public record of their issuance, and there was testimony indicating that Bannum never even advised ANC 5–B of the letters. David Lowry, Bannum's executive director, testified:

> Q. Mr. Lowry, did you at any point in time give copies of the November or December letters to any ANC member?
> . . .
> A. I don't believe I did.

The ANC surely cannot be required, or even expected, to appeal from an "administrative decision" of which it had no notice.

Perhaps because of the confusing nature of this unofficial and informal practice, Zoning Administrators are no longer permitted to mail out concurrences on non-governmental stationery.

es.[11] Laches has two elements: the party asserting a claim of laches must show both (1) that it has been prejudiced by the delay and (2) that the delay was unreasonable. *Beins v. District of Columbia Board of Zoning Adjustment,* 572 A.2d 122, 126 (D.C.1990). Because it was not improper for the ANC to wait until after the issuance of the building permits before appealing to the BZA, and because it seasonably did so, the BZA properly held that ANC 5–B did not unreasonably delay in filing its appeal until seven days after the issuance of the revised building permit. Nor can Bannum show that it suffered prejudice as a result of the delay of which it now complains. Since most of Bannum's expenses were incurred immediately after it obtained the permit in December 2002, it could not have been prejudiced by any delay on the part of the ANC before that date. Moreover, because it knew or should have known that other parties could appeal from the issuance of the permit within sixty days (as ANC 5–B did), Bannum cannot validly blame the ANC for these expenditures. As the BZA said, "Bannum could not assume that its permit was valid until after the 60–day jurisdictional window for appeals had expired, [and therefore] any expenditures before that date were made at its own risk." Thus we hold that Bannum has not met either requirement of the two-part test for laches.

## C. *Estoppel*

■■■■■ Bannum's next assertion is that the BZA was estopped from denying its request for a building permit because, in reliance on the two DCRA concurrence letters and the notice it gave to the Ward 5 Councilman, it refurbished the warehouse at a cost of nearly half a million dollars, and because equity favors use of the warehouse as a CCC. To succeed on a claim for estoppel in the circumstances presented here, Bannum must make a six-part showing: "(1) expensive and permanent improvements, (2) made in good faith, (3) in justifiable and reasonable reliance upon (4) affirmative acts of the District government, (5) without notice that the improvements might violate the zoning regulations; and (6) equities that strongly favor the petitioner[]." *Interdonato v. District of Columbia Board of Zoning Adjustment,* 429 A.2d 1000, 1003 (D.C.1981). Bannum's estoppel claim fails because at least one, and perhaps two or three, of these six elements are lacking.

■■■■■ First, Bannum's reliance on the DCRA concurrence letters was not "justifiable and reasonable." As we have often held, "It is the Board, not the Zoning Administrator, which has final administrative responsibility to interpret the zoning regulations." *Murray v. District of Columbia Board of Zoning Adjustment,* 572 A.2d 1055, 1058 (D.C.1990); *see* D.C.Code § 6–641.07(g)(4) (2001) (empowering the BZA to "reverse or affirm, wholly or partly, or ... modify" any order or decision appealed from, or to "make such order as may be necessary to carry out its decision"). This is especially true given the unofficial nature of the DCRA's concurrences; that each concurrence consisted of a single signature on the same sheet of paper mailed by Bannum—without any further explanation—at least suggests that the concurrence lacked the weight of law. At the very least, Bannum should have known that the DCRA's concurrences

---

**11.** Although the concurrence letters were issued in 2000 and 2001, Bannum's laches claim is based on its assertion that the ANC received "actual notice," at a public meeting in April 2002, of Bannum's plans to operate the proposed CCC and its understanding that the DCRA had ruled favorably on its zoning application. The ANC's appeal was filed nine months later, in January 2003.

were not the final word on the subject, since the BZA had not yet been heard from at all.

In addition, the record at least suggests the possibility that Bannum's improvements to the warehouse might not have been made in good faith. Bannum did not provide the DCRA with a copy of either the RFP or the contract, nor did it reveal the details about the operation of the proposed CCC that were sent in the earlier letters to the Mayor and others regarding the lack of bars, guards, or locks, or the fact that the facility could hold up to 260 residents. Finally, we cannot say that the BZA acted unreasonably in concluding that the equities favored the ANC, since Bannum's large CCC "could easily destabilize adjacent residential neighborhoods."

We conclude that Bannum's estoppel argument is untenable and must be rejected.

### D. *Constitutional Claims*

■■■ Bannum additionally comes forth with two constitutional claims. It argues that the BZA's interpretation of section 801.7(k) of the regulations violates the Supremacy Clause and denies it the equal protection of the laws. Whether Bannum sufficiently flagged either of these issues in the proceedings before the BZA is questionable at best.[12] "In the absence of exceptional circumstances, this court will not entertain contentions not raised before the agency." *Glenbrook Road Ass'n v. District of Columbia Board of Zoning Adjustment,* 605 A.2d 22, 33 (D.C.1992). But even if Bannum had explicitly argued these points before the BZA, they would not succeed before this court.

■■■ Bannum's first constitutional argument is that the BZA's decision must be overturned because it is pre-empted by federal law. Federal law may pre-empt state law when, *inter alia,* "it is impossible to comply with both state and federal law." *California Coastal Comm'n v. Granite Rock Co.,* 480 U.S. 572, 581, 107 S.Ct. 1419, 94 L.Ed.2d 577 (1987). Bannum maintains that the BZA's reading of section 801.7(k) frustrates the full purpose and objectives of Congress, as embodied in 18 U.S.C. § 3621 [13] and 18 U.S.C. § 3624,[14] as well as the National Capital Revitalization Act ("NCRA"), codified in part at D.C.Code § 24–101 (2001),[15] because the BZA's interpretation of the zoning regulation would restrict Bannum's ability to locate CCCs

---

12. In its motion for reconsideration filed with the BZA, Bannum argued only that the BZA's interpretation of the regulations was "putting this [federal CCC program] in jeopardy."

13. 18 U.S.C. § 3621(b) provides:

The Bureau [of Prisons] may designate any available penal or correctional facility that meets minimum standards of health and habitability established by the Bureau, whether maintained by the Federal Government or otherwise . . . .

14. 18 U.S.C. § 3624(c) provides:

The Bureau of Prisons shall, to the extent practicable, assure that a prisoner serving a term of imprisonment spends a reasonable part, not to exceed six months, of the last 10 per centum of the term to be served under conditions that will afford the prisoner a reasonable opportunity to adjust to and prepare for the prisoner's re-entry into the community. The authority provided by this subsection may be used to place a prisoner in home confinement.

15. D.C.Code § 24–101(a) provides in part:

[A]ny person who has been sentenced to incarceration pursuant to the District of Columbia Code . . . shall be designated by the Bureau of Prisons to a penal or correctional facility operated or contracted for by the Bureau of Prisons, for such term of imprisonment as the court may direct.

Further, section 24–101(b) transferred control over all District of Columbia felons from the District of Columbia Department of Corrections to the federal Bureau of Prisons, effective not later than December 31, 2001.

wherever it wants. This argument fails, however, because it is possible for Bannum to comply with both the federal statutory mandate and section 801.7(k): federal CCCs may be built and operated in the District of Columbia, so long as they fit within the language of the regulation. The existence of several other CCCs in Ward 5 alone strongly suggests that the objectives of 18 U.S.C. § 3621, 18 U.S.C. § 3624, and the NCRA are being successfully fulfilled without undue hindrance from the zoning regulations. We see no conflict or inconsistency between the BZA's decision and any provision of federal law.

▇▇▇ Bannum's other constitutional argument is that because the BZA denied Bannum's building permits while granting them to two other CCCs in the District of Columbia—Hope Village and CCC–4—which also housed more than twenty residents, the BZA has violated Bannum's right to equal protection under the Fifth Amendment. *See Bolling v. Sharpe*, 347 U.S. 497, 498–499, 74 S.Ct. 693, 98 L.Ed. 884 (1954). These other CCCs, however, did not seek or obtain permits under section 801.7(k), nor indeed could they have done so. Hope Village, unlike Bannum's proposed CCC, was not located in a C–M zone but in a residential zone (R–5–A). CCC–4 was in a C–M zone, but it was not a "temporary" facility, having been in operation for at least twenty years.[16] Thus they are not valid comparators for equal protection purposes, and Bannum's equal protection argument evaporates.

We turn, accordingly, to the merits.

16. CCC–4 apparently is no longer in existence.

17. However, the concept of "community correctional centers" is not new, nor is the controversy surrounding them. *See Brawner Building, Inc. v. Shehyn*, 143 U.S.App. D.C.

III

▇▇▇ The main issues in this case are whether Bannum's proposed CCC is a "temporary detention or correctional institution," as that term is used in 11 DCMR § 801.7(k), and whether the CCC would occupy the former warehouse for a period of three years or less, in which case Bannum would be entitled under section 801.7(k) to be granted a building permit "as a matter of right." Bannum contends that, because the language of the regulation is clear and straightforward, the BZA impermissibly looked to the legislative history of the regulation in construing it.

▇▇▇ "If the statutory language is unambiguous, in the absence of a clearly expressed legislative intent to the contrary, that language must ordinarily be regarded as conclusive." *Reves v. Ernst & Young*, 507 U.S. 170, 177, 113 S.Ct. 1163, 122 L.Ed.2d 525 (1993) (citation omitted). In this case, however, we think it was reasonable for the BZA to conclude that there was some ambiguity in the term "correctional institution." The terms used in section 801.7(k) are not defined anywhere in the zoning regulations, nor do the regulations even mention "community correctional center," a term unfamiliar to anyone outside the penal industry. In addition, because no one has ever obtained a building permit under section 801.7(k), the available precedents and case law provide scant guidance.[17] The principle announced in *Reves* and similar cases is therefore of no help to Bannum.

▇▇▇ Another regulation, 11 DCMR § 199.2(g), directs the BZA to consult the

125, 136, 442 F.2d 847, 858 (1971) ("As the parties to this suit and the District Court agree, community correctional centers, or halfway houses, are in the public interest. The question is, where are they to be located.").

dictionary to clarify the meaning of undefined terms used in the regulations.[18] The BZA did so, but because the dictionary definitions shed little light on whether section 801.7(k) encompassed a community correctional center, the BZA properly looked to the origins of section § 801.7(k)—the regulatory equivalent of legislative history—for guidance.[19]

In analyzing that legislative history, the BZA discovered that in the late 1960s and early 1970s, certain consent decrees mandated that the District of Columbia take affirmative steps to restructure its overcrowded jail system. In particular, those decrees required a population cap at each penal facility and prescribed other methods to relieve overcrowding. In 1972 the Zoning Advisory Council ("ZAC") proposed that the regulations be amended by adding what would become subsection 801.7(k). The ZAC explained in its Final Report to the Zoning Commission that the new subsection would allow the Department of Corrections to "lease private industrial property for the purpose of establishing correctional facilities to accommodate overflow population from the established institutions or as a temporary facility while they proceed with the process of budget, acquisition, and development of permanent facilities." [20]

This legislative history amply supports the BZA's conclusion that Bannum's proposed CCC is not a "temporary detention or correctional facility" within the meaning of section 801.7(k), as envisioned by the ZAC and the Zoning Commission. First, as to the nature of the CCC, the BZA noted that the legislative history of section 801.7(k) clarified that the intention of its drafters was to provide interim "overflow" confinement for prisoners until more permanent facilities were developed. Given this clear enunciation of legislative (regulatory) intent, coupled with Bannum's own description of the CCC's daily operations (no locks, bars, or armed guards; prisoners free to come and go almost at will), the BZA appropriately concluded that the CCC did not fit within the language of section 801.7(k). Bannum has never claimed that its CCC was built to relieve the problem which this regulation was intended to address, namely, to provide temporary relief from a prison overcrowding crisis during construction of more permanent facilities elsewhere. The BZA correctly noted that the CCC inmates "are at the facility, not because there is nowhere else to put them, but because they chose to be there."

The Zoning Commission enacted section 801.7(k) under the pressure of a series of

---

**18.** 11 DCMR § 199 contains almost nineteen pages of definitions of terms found in the zoning regulations. Subsection 199.2(g) provides: "Words not defined in this section shall have the meanings given in *Webster's Unabridged Dictionary.*"

**19.** Bannum argues that since each of the individual terms within the phrase "community correctional center" is defined in the dictionary, there was no need to turn to the legislative history. We disagree. "[E]ven where the words of a statute have a 'superficial clarity,' a review of the legislative history ... may reveal ambiguities that the court must resolve." *Peoples Drug Stores, Inc. v. District of*

*Columbia,* 470 A.2d 751, 754 (D.C.1983) (en banc) (citations omitted).

**20.** Though Bannum refers to some evidence suggesting that section 801.7(k) was not enacted in response to prison overcrowding, substantial evidence supports the BZA's opposite finding. The BZA based that finding both on the ZAC's Final Report and on the testimony of Hulon Willis, Bannum's own witness. Mr. Willis, a former Department of Corrections compliance officer who was qualified as a corrections expert, testified that the regulation was "developed as a response to pressures of overcrowding" at the Department's facilities.

consent decrees. Faced with an inundation of prisoners, it could not reasonably have envisioned a facility without guards, locks, or bars, in which the inmates could obtain permission to leave for days at a time. But that is what Bannum sought to create. The BZA concluded, and we agree, that Bannum's proposed CCC was not a "correctional institution" in the sense that the Zoning Commission would have understood that term; it much more closely resembles a large residential facility than a jail. *See Campbell v. McGruder*, 416 F.Supp. 111, 117 (D.D.C.1976) (the Department of Corrections never constructed "demountable housing units" to provide temporary relief for overcrowded jails, in part because such facilities were not secure enough to hold prisoners).[21]

 As to the duration of the proposed CCC, the BZA again cited the ZAC Final Report to show that the Zoning Commission wanted to emphasize the temporary nature of such facilities, specifically by limiting their very existence to a period no longer than three years. That report stated that the ZAC's proposed new regulatory language was intended to "make it clearer that such installations would be temporary in nature." The amendment therefore provided that any facility authorized under section 801.7(k) must be "temporary" and imposed an explicit three-year limit on its existence. We agree with the BZA's reading of the regulation as imposing two separate requirements: "Each of the two elements, 'temporary' and 'for a period not to exceed three (3) years,' must

be met for a use to fall within the purview of the subsection."

In their letters to the community, however, both the BOP and Bannum said that they perceived the contract length to be for five years. Because the lease ran concurrently with the life of the contract, if the contract lasted for five years, then so would the lease. The lease even implies that it could remain in force for much longer: "in no event shall the expiration of Bannum's occupancy of the Premises under this Lease be later than December 31, 2009." During the BZA hearings, Bannum's executive director, David Lowry, was also forced to concede that the lease "runs concurrent with the government contract" and that the contract had "a two-year base period and three one-year options." Faced with this and other evidence, the BZA quite reasonably concluded:

> Clearly Bannum did not intend its use to be temporary. Rather, the lease manifests Bannum's plan to remain for so long as it had the BOP contract, perhaps even longer, and to seek "extensions" of its certificate of occupancy, which DCRA could not have lawfully issued. Its claim of temporary use was thus a sham.... This was to be a permanent facility established in contravention of the Zoning Regulations.

We are fully satisfied that the BZA was correct in concluding that the CCC failed the "temporary ... not to exceed three (3) years" part of the section 801.7(k) test.[22]

---

**21.** Bannum points out that if a CCC inmate "is not where he is supposed to be," he may be placed on escape status. But that does not invalidate the BZA's decision or make it unreasonable, for the status of an escaped prisoner had no bearing on the issue before the BZA. The fact that a halfway house may be deemed a "penal institution" for the purposes of the criminal escape statute, *see Armstead v.*

*United States*, 310 A.2d 255 (D.C.1973), is irrelevant to the question before the BZA and this court in this case, which is whether Bannum's community correctional center (assuming it is equivalent to a halfway house) is a "correctional institution" within the meaning of the zoning regulations.

**22.** Bannum reads "temporary" to mean simply that matter-of-right zoning expires after

In sum, we hold that the language of 11 DCMR § 801.7(k) and its legislative history, combined with the testimonial and documentary evidence before the Board of Zoning Adjustment, provided ample support for the BZA's decision that the zoning regulations did not permit Bannum's proposed CCC, an unsecured facility housing scores of convicted felons, to be built and operated in a C–M zone.

## IV

For all of the foregoing reasons, the decision of the BZA is

*Affirmed.*

three years. Thus Bannum claims a three-year entitlement to the permit under section 801.7(k) and asserts that, at the end of that period, it could then seek a variance in order to continue operating in a C–M zone. We strongly disagree. Even a glance at the legislative history shows that the regulation's temporal limitations on such facilities are to be strictly construed. Because the Zoning Commission specifically amended the regulation to "make it clearer that such installations would be temporary," we cannot find error in the BZA's conclusion that five years was too long a period to fit properly within the limits imposed by section 801.7(k).