*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 12-AA-1444

WARD 5 IMPROVEMENT ASSOCIATION, PETITIONER,

V.

DISTRICT OF COLUMBIA
BOARD OF ZONING ADJUSTMENT, RESPONDENT.

On Petition for Review of an Order of the
District of Columbia Board of Zoning Adjustment
(BZA-18114)

(Argued January 29, 2014                    Decided August 21, 2014)

*Don Padou* for petitioner.

*Richard S. Love*, Senior Assistant Attorney General for the District of Columbia, with whom *Irvin B. Nathan*, Attorney General, *Todd S. Kim*, Solicitor General, and *Donna M. Murasky*, Deputy Solicitor General, were on the brief, for respondent.

Before BECKWITH and MCLEESE, *Associate Judges*, and FERREN, *Senior Judge*.

BECKWITH, *Associate Judge*:    Beginning in April 2010, the Zoning Administrator (ZA), whose office is part of the District of Columbia Department of Consumer and Regulatory Affairs (DCRA), granted a series of certificates of

occupancy[1] to Stadium Group LLC to operate "Stadium Club" as a "Nightclub and Restaurant with accessory parking (Not a Sexually Oriented Business Establishment)" at 2127 Queens Chapel Road N.E., a property zoned C-M-2. Petitioner Ward 5 Improvement Association (Ward 5) appealed the issuance of those certificates to the District of Columbia Board of Zoning Adjustment (BZA). Ward 5 argued that Stadium Club was a "sexually-oriented business enterprise" (SOBE), and therefore under 11 DCMR § 801.2 (2008) could not operate as a matter of right in a C-M-zoned area. DCRA responded that "a nightclub that offers nude dancing entertainment is not a sexually-oriented business establishment" *per se* and claimed that the ZA did not err in issuing the certificates of occupancy. Stadium Club intervened to defend the ZA's decision.[2] In an August 24, 2012, order, the BZA, by a 4-1 vote, upheld the ZA's decision to designate Stadium Club as a non-SOBE—an order that Ward 5 now challenges.

Ward 5 contends, as it did before the BZA, that the ZA erred in issuing the certificates of occupancy because Stadium Club is a "sexually-oriented business establishment"—that is, by regulation, "an establishment that presents as a substantial or significant portion of its activity, live performances, films, or other

---

[1] *See* 11 DCMR § 3203.1 (2010); 16 DCMR § 3312.1 (2005).

[2] Stadium Club has not intervened in the present petition for review.

materials, that are distinguished or characterized by their emphasis on matters depicting, describing, or related to specified sexual activities and specified anatomical areas." 11 DCMR § 199.1 (2010). The BZA, as respondent in this case, acknowledges that the dancers at Stadium Club are "sometimes nude" and display the "anatomical areas" specified in the regulations.[3] The BZA contends, however, that Stadium Club is not a SOBE because the dancers, according to the planned use of the establishment, do not engage in the "[s]pecified sexual activities." These activities include any of the following: "(a) Acts of human masturbation, sexual intercourse, sexual stimulation or arousal, sodomy, or bestiality; and (b) Fondling or other erotic touching of human genitals, pubic region, buttock, or breast." 11 DCMR § 199.1.

We conclude that the BZA, in assessing whether the ZA properly granted the certificates of occupancy, erred in relying almost exclusively on information available to the ZA at the time he granted the first permanent certificate of occupancy on June 22, 2010. The BZA should have fully considered, as well, information available to the ZA at the time he granted the second permanent

---

[3] The "[s]pecified anatomical areas" comprise "parts of the human body as follows: (a) Less than completely and opaquely covered human genitals, pubic region, buttock, and female breast below a point immediately above the top of the areola; and (b) Human genitals in a discernibly turgid state, even if completely and opaquely covered." 11 DCMR § 199.1.

certificate of occupancy on June 24, 2011—including, in particular, information about how Stadium Club had been operating since it opened a year earlier. The BZA also erred in failing to make certain essential findings of fact and conclusions of law regarding whether Stadium Club featured the "sexual activities" specified in 11 DCMR § 199.1. We therefore vacate the BZA's August 24, 2012, order and remand the case to the BZA for additional findings of fact, conclusions of law, and further proceedings consistent with this opinion.

## I.    Factual Background

Zoning Administrator Matthew LeGrant issued temporary certificates of occupancy to Stadium Club on April 2 and April 21, 2010, both times approving use as a "Nightclub and Restaurant with accessory parking (Not a Sexually Oriented Business Establishment)." Stadium Club opened on April 22. Stadium Club featured three stages for dancing and twelve eight-by-eight-foot "lounges" used for private dances "where entertainers would perform in the nude," according to the factual findings in the BZA's August 24, 2012, order. Stadium Club's "Rules and Regulations for Dancers" state that dancers may not "fondle or touch their genitals, pubic region, buttocks or breasts in a suggestive or erotic manner" and may not "simulate (or perform) any acts of intercourse, masturbation, sodomy, bestiality or other acts intended to stimulate or arouse." In addition, according to

these rules, dancers must limit "floorwork" to three seconds[4] and must refrain during performances from physical contact with customers and with other dancers.

In letters and emails sent to DCRA on May 10, May 20, June 7, and June 10, 2010, Don Padou, a resident of the District's Fifth Ward, urged DCRA to deem Stadium Club a SOBE. On June 11, the Ward 5 Improvement Association—led by Don Padou and including some of Stadium Club's neighbors—appealed to the BZA the ZA's issuance of the temporary certificate of occupancy, alleging that "Stadium Club is a sexually oriented business" and that "the Zoning Administrator erred in failing to apply the relevant zoning regulations." The BZA notified the ZA of Ward 5's appeal on June 15. One week later, on June 22, 2010, the ZA granted a permanent non-SOBE certificate of occupancy to Stadium Club. Ward 5 immediately asked the BZA to amend its appeal to include this first permanent certificate of occupancy.

---

[4] Another version of Stadium Club's rules limits "floorwork" to five seconds at a time. Neither the BZA nor the Stadium Club's rules define "floorwork." Stadium Club co-owner James Redding testified before the BZA that dancers engage in floorwork when they "[lie] on the floor and dance on the floor" and that Stadium Club's rules limit the duration of dancers' floorwork "because we want to have a classy establishment." He stated that "a young lady climbs the pole, which is classy, and they swirl around," and "when they come back down, they will hit the floor and do a split . . . almost like ballerinas, and then they must come right back up. That's the reason why that's put in there you must be off the floor in five seconds."

On July 19, 2010, the D.C. Office of Zoning, and thus the ZA, received notarized affidavits[5] from Benjamin Petok and Marshall Chriswell, two individuals recruited by Ward 5 to visit Stadium Club and report their observations. They had visited on the evening of June 16, 2010, for approximately five hours. In his affidavit, Mr. Petok described how dancers began their performances wearing a bikini or dress and removed all their clothing during the performance. According to Mr. Petok, one dancer, "Star," would "crouch" and "touch the area around her vagina" when a customer approached the stage, and "[a]fter exposing her vagina to the customer, she would ask for a tip to be placed in her elastic garter belt." Mr. Petok described how another dancer, "Cory," would "stand[] facing away from the customer and bend[] over, exposing her anus and vagina." In a private back room performance, according to Mr. Petok's affidavit, Cory rubbed her nipples and vagina and "whispered in [his] ear" and "rubbed her hand on [his] chest and back." Mr. Petok also reported that a third dancer, "Sonny," in a different backroom performance, positioned herself "very close" to his face, "fondled" her breasts, sat and "grind[ed]" on his lap, and permitted him "to touch her legs, back, buttocks

---

    [5] The ZA acknowledged receiving these affidavits in his September 27, 2011, testimony before the BZA.

and breasts."[6] When Sonny performed "table dances"—a performance on a lounge table for an individual patron or group of patrons—"she encouraged patrons to touch her legs and arms."

On February 9, 2011, Stadium Club applied for a second permanent certificate of occupancy, seeking to add a "summer garden" with 15 seats. Evaluating this application, the ZA, "given the questions that had been raised" decided "to do some further investigation to ensure that the use was still a use that's approvable under the Zoning Regulations," as he testified before the BZA. He sent a member of his staff, Justin Bellow, to observe the performances. Mr. Bellow visited Stadium Club on Thursday, March 24, 2011, for approximately 40 minutes, starting at 11:30 p.m. In a post-visit report, he stated that dancers began their performances in bikinis or lingerie and "disrobe[d] while performing." He stated that dancers and patrons had "minimal interaction" during table dances, "as dancers performed on tables while the patrons remained seated." He stated that he witnessed "instances where a dancer would momentarily touch her breast and/or

---

[6] Marshall Chriswell's affidavit reflects a similar experience. He stated that performers dancing on stage came within inches of patrons and that many "fondled their naked breasts and genitalia." On January 25, 2011, Ward 5 also attached the statement of a third visitor, James Williamson, to a filing submitted with the BZA and served on DCRA. Mr. Williamson's statement described his January 4, 2011, visit with details similar to those described by Mr. Petok and Mr. Chriswell.

buttock, but these instances lasted for no more than a second and in [his] opinion did not rise to the level of fondling." He finally asserted that he "did not witness any of the dancers engaging in any acts of human masturbation, sexual intercourse, sexual stimulation or arousal, sodomy, or bestiality during my time at the establishment." He did not examine the back rooms, and in his testimony before the BZA, he stated that he could not remember whether he heard patrons "whooping or yelling when a dancer made a particular move." In response to questioning, Mr. Bellow acknowledged that he saw the dancers "bend over and expose their anus or vagina to the patrons," but claimed that "[i]t's not like they just completely stopped what they were doing and decided to bend over. Again, it's rhythmic. It's maneuvers being performed in time with the music."

In addition to debriefing with Mr. Bellow, the ZA discussed the establishment's planned use with its owners, reviewed its rules for dancers, and consulted with personnel from the District of Columbia Alcoholic Beverage Regulation Administration about their visits to Stadium Club.[7] The record does

---

[7] In a filing submitted to the BZA, DCRA included the January 20, 2011, affidavit of Jabriel Shakoor, an ABRA investigator, who stated that he visited Stadium Club seven times in July 2010 and "observed female dancers performing nude," but "did not observe any acts of human masturbation, sexual intercourse, sexual stimulation or arousal, sodomy, or bestiality." He also stated that he "did not observe any dancer engaging in any fondling or other erotic touching of a patron's or her own genitals, pubic region, buttocks or breasts."

not reflect what consideration the ZA gave to Mr. Petok's and Mr. Chriswell's affidavits. On June 24, 2011, the ZA granted Stadium Club a second permanent certificate of occupancy, again approving use as a non-SOBE nightclub and restaurant.

Five days later, Stadium Club moved to dismiss Ward 5's appeal, arguing that "[a]s the Certificate which is at issue in this appeal has been superseded and no longer is utilized, this appeal is moot." Ward 5 opposed the motion to dismiss and moved to amend its appeal to include the second permanent certificate of occupancy. DCRA agreed with Stadium Club that Ward 5's appeal of the first permanent certificate was "moot" and urged the BZA to deny Ward 5's motion to amend because "DCRA's review and approval of the June 24th CO constitute[d] a new zoning decision under 11 DCMR 3100.2."[8]

At its hearing on July 12, 2011, the BZA declined to make "actual formal decisions on any of the motions before us." It decided, however, to hold an additional evidentiary hearing to "evaluate whether or not the ZA erred on the issuance of this new Certificate of Occupancy," as BZA Chairperson Meridith

---

[8] 11 DCMR § 3100.2 states in its entirety: "The Board, pursuant to the Zoning Act, shall also hear and decide appeals where it is alleged by the appellant that there is error in any order, requirement, decision, determination, or refusal made by any administrative officer or body, including the Mayor, in the administration or enforcement of the Zoning Regulations, Title 11 DCMR."

Moldenhauer explained. At its hearing on September 27, 2011, the BZA appeared to indicate that it would grant Ward 5's motion to add the second permanent certificate of occupancy to the appeal.[9] It also heard testimony from ZA Matthew LeGrant about his decision to grant a second permanent certificate of occupancy to Stadium Club. The BZA permitted Ward 5 to amend its appeal to include the second permanent certificate because, it explained in its August 24, 2012, order, "issuance of the latest certificate of occupancy did not dispose of the grounds for the appeal."[10] Reviewing the ZA's decision, the BZA concluded that the ZA "properly made a determination that the planned use of the subject property would not constitute a sexually oriented business establishment, as defined in the Zoning Regulations, because one required element of the zoning definition of a SOBE, 'specified sexual activities,' would not be present."

---

[9] At the September 27, 2011, hearing, Ms. Moldenhauer stated that the BZA "wanted to have a limited hearing for the purposes of obtaining testimony and evidence in regards to the new C of O that was issued," and that the BZA would consider the later certificate because "the same claims are being made from the prior C of O to the current C of O."

[10] The case caption of the BZA's August 24, 2012, order listed the second temporary certificate (April 21, 2010, No. CO1001838), the first permanent certificate (June 22, 2010, No. CO1002471), and the second permanent certificate (June 24, 2011, No. CO1101152).

## II.    Analysis

"In reviewing a BZA decision, we must determine (1) whether the agency has made a finding of fact on each material contested issue of fact; (2) whether substantial evidence of record supports each finding; and (3) whether conclusions legally sufficient to support the decision flow rationally from the findings." *Economides v. District of Columbia Bd. of Zoning Adjustment*, 954 A.2d 427, 433 (D.C. 2008) (internal quotation marks and citation omitted).  "We defer to the BZA's interpretation of the zoning regulations unless its interpretation is plainly wrong or inconsistent with the governing statute."  *Kuri Bros. v. District of Columbia Bd. of Zoning Adjustment*, 891 A.2d 241, 244 (D.C. 2006).  "[T]he function of the court in reviewing administrative action is to assure that the agency has given full and reasoned consideration to all material facts and issues," and we "can only perform this function when the agency discloses the basis of its order by an articulation with reasonable clarity of its reasons for the decision."  *Dietrich v. District of Columbia Bd. of Zoning Adjustment*, 293 A.2d 470, 473 (D.C. 1972); *see also Kalorama Citizens Ass'n v. District of Columbia Bd. of Zoning Adjustment*, 934 A.2d 393, 401 (D.C. 2007).  In contested cases such as this one, factual findings on "each contested issue of fact" and legal conclusions must be in writing and supported by "reliable, probative, and substantial evidence."  D.C. Code § 2-509 (e) (2012 Repl.).  We may affirm, modify, set aside, or remand for

further proceedings, "as justice may require." D.C. Code § 2-510 (a) (2012 Repl.).

## A.    Failure To Make Factual Findings

In this case, the BZA failed to make essential factual findings regarding the information available to the ZA at the time he issued the second permanent certificate of occupancy on June 24, 2011. Without such factfinding, the BZA could not assess the reasonableness of the ZA's decision to issue that certificate. This failure was no mere oversight. Rather, the BZA declined to consider any allegations involving "the actual operation of the establishment," which, it reasoned, were not "fact[s] that could have been known to the Zoning Administrator while assessing the merits of the application for a certificate of occupancy for the future use of the subject property in April 2010 when the determination was initially made." Thus the BZA made "no findings in this order about the actual operations of the Stadium Club" and assigned "limited evidentiary value" to the affidavits provided by Ward 5's witnesses in part because "the information they contained was not provided to DCRA before issuance of the first permanent certificate of occupancy."

The BZA erred under the circumstances in declining to consider a substantial body of material information proffered about the club's operations during the period after issuance of the temporary certificates of occupancy in April

2010. The BZA has provided no justification, and we know of none, for limiting factfinding to information available before the *first* permanent certificate of occupancy, issued June 22, 2010, when the validity of the *second* permanent certificate of occupancy, issued June 24, 2011, was also before the BZA.

In declining to consider facts that "could have been known"—as the BZA put it—to the ZA at the time he issued the June 24, 2011, certificate, the BZA distinguished information available to the ZA "before approving issuance of a certificate of occupancy (which is germane to the Board's decision on an appeal of the decision to issue a certificate of occupancy)" from "information that becomes known after an establishment begins operation (which is not relevant to such an appeal but could provide the basis for an enforcement action if an entity is operating outside the scope of its authorized use)."[11] This distinction, whatever its

---

[11] In support of this proposition, the BZA relies on BZA Appeal No. 17439 of ANC 6A (March 30, 2007) and BZA Appeal No. 13715 of Dennis P. Sobin (December 3, 1982). Both cases in fact support our opinion directing the BZA to consider on remand the information available to the ZA—including information regarding "specified sexual activities"—at the time the ZA issued the second permanent certificate. *See* Appeal No. 17439 at 6 ("The issue before this Board is whether the facts known to the Acting Zoning Administrator at the time the Certificate of Occupancy was issued could have reasonably led him to believe that the proposed use was to be a restaurant, and not a fast food restaurant."); Appeal No. 13715 at 4 ("The Board will make its determination based only on the evidence that the Zoning Administrator had before him at the time of his decision.").

merits, does not apply in this case, where Ward 5 challenged the issuance of the June 24, 2011, certificate of occupancy. Because Stadium Club was operational when the ZA issued the second permanent certificate of occupancy, the club's actual operations were, in fact, "germane to the Board's decision on an appeal of the decision to issue a certificate of occupancy." If the ZA, before granting that certificate, was to determine whether Stadium Club "was capable of operation as a restaurant/nightclub that is not a sexually oriented business establishment," then the efficacy of the "measures . . . put in place by the managers of the establishment to encourage compliance" was surely relevant to that determination.

In assessing whether the ZA should have granted the certificates, the BZA relied heavily "on representations made by the Stadium Group about the planned performances." But prior to the issuance of the second permanent certificate on June 24, 2011, both the ZA and BZA had additional relevant information, including: Stadium Club owner James Redding's testimony at the October 26, 2010, hearing about personal lap dances performed in the back rooms; Ben Petok's affidavit and testimony, also at the October 26, 2010, hearing, alleging, for example, that "[d]uring the table dance, 'Cory' would remove all of her clothing and dance nude, rubbing her breasts and vagina and exposing her genetalia [sic] to her patrons"; and the report from Justin Bellow's March 24, 2011, visit to Stadium Club, in which he noted "instances where a dancer would momentarily touch her

breast and/or buttock." Mr. Bellow also answered yes when asked in his September 27, 2011, testimony before the BZA if the dancers had "ben[t] over and expose[d] their anus or vagina to the patrons." Because the BZA disregarded or assigned limited value to this and other information available to the ZA, the BZA did not have a firm evidentiary foundation to justify its determination that the ZA "properly made a determination that the planned use of the subject property would not constitute a sexually oriented business establishment."[12]

## B.     Failure To Define Key Terms

The BZA also leaves us without definitions of key terms in the regulation listing "[s]pecified sexual activities," particularly of [1] "[f]ondling," [2] "other erotic touching of human genitals, pubic region, buttock, or breast," and [3] acts of "sexual stimulation or arousal." 11 DCMR § 199.1. The regulations provide that "[w]ords not defined" in the zoning regulations "shall have the meanings given in

---

[12]    We note that Mr. Bellow could not testify about the private rooms or about customers' reaction to the dancers. On remand, the Board may consider both whether the ZA had adequate information and whether he adequately considered the information he had. At this juncture we need not decide whether the BZA's mandate—that it "shall . . . hear and decide appeals where it is alleged by the appellant that there is error in any order, requirement, decision, determination, or refusal made by any administrative officer or body, including the Mayor, in the administration or enforcement of the Zoning Regulations," 11 DCMR § 3100.2— compels the BZA to consider not just what the ZA actually knew but also what the ZA reasonably should have known. *See also* D.C. Code § 6-641.07 (g)(2) (listing BZA powers).

Webster's Unabridged Dictionary." 11 DCMR § 199.2. Webster's definition of "fondle" includes: "to treat with doting indulgence," "to handle tenderly, lovingly, or lingeringly," to "treat caressingly," and "to show affection or desire by caressing."[13] In his testimony before the BZA, the ZA emphasized the word "lingeringly" and asserted that "fondling" had a "temporal aspect" and that "there has to be some time spent on the touching activity to be considered fondling, so a brushing of the body, which is a very short period of time, does not have the time frame that a fondling activity would have." Based on this explanation, the BZA found that the ZA "reasonably concluded that 'fondling,' as defined in the dictionary, has a temporal aspect" and that the ZA "reasonably distinguished 'fondling' from other forms of touching when assessing the observations" in Mr. Bellow's report.

The BZA's analysis here is deficient, first, in not making clear whether the BZA was deferring to the ZA's interpretation of "fondling" or interpreting "fondling" itself. We have held that "'[i]t is the Board, not the Zoning Administrator, which has final administrative responsibility to interpret the zoning

---

[13] WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY OF THE ENGLISH LANGUAGE, UNABRIDGED 883 (2002). During his BZA testimony, the ZA paraphrased this same definition when asked to define "fondling": "I'll read the definition of 'fondling' from Webster's. . . . Fondle or fondling is to handle tenderly, lovingly, or lingeringly or caress."

regulations.'" *Bannum, Inc. v. District of Columbia Bd. of Zoning Adjustment*, 894 A.2d 423, 431 (D.C. 2006) (quoting *Murray v. District of Columbia Bd. of Zoning Adjustment*, 572 A.2d 1055, 1058 (D.C. 1990)); *see also District of Columbia, Dep't of Pub. Works v. L.G. Indus., Inc.*, 758 A.2d 950, 956 (D.C. 2001) (stating that the BZA "is charged with interpreting the zoning regulations"). The BZA's interpretive responsibility, therefore, is de novo. The BZA's responsibilities to "hear and decide" zoning appeals under D.C. Code § 6-641.07 (g)(2) and 11 DCMR § 3100.2 require more of the BZA than deference to the ZA, particularly where the ZA's interpretation of "fondling" is not obvious. Webster's definition of "fondle" focuses more on the nature of the action than on its length, yet the ZA emphasized "lingeringly"—a single, nonessential adverb in a single definition ("to handle tenderly, lovingly, or lingeringly"), alongside other definitions (such as "to show affection or desire by caressing"). The BZA may consider the ZA's views in arriving at its own de novo interpretation, but in this case, in merely saying that the ZA was "well informed about the relevant definitions" and had "sufficient information" to make his determinations, the BZA does not elicit our confidence that its definition and application of "fondling" were informed by anything more than the ZA's own opinion.

Second, the regulations distinguish "fondling" from "other erotic touching of human genitals, pubic region, buttock, or breast." 11 DCMR § 199.1. Yet the

BZA did not consider whether the ZA reasonably made determinations regarding erotic touching at Stadium Club. It left unanswered whether a dancer who "momentarily brush[ed] her breast and/or buttock," as Mr. Bellow observed, or "rubb[ed] her breasts and vagina," as Mr. Petok observed, would be engaging in "erotic touching." It is not enough to cite Stadium Club's Rules and Regulations—specifically that "dancers shall not fondle or touch their genitals, pubic region, buttocks or breasts in a suggestive or erotic manner"—where mere rules may not suffice to prevent these activities in an environment that rewards provocative conduct. *See Declaration of James Williamson* (stating, based on his January 4, 2011, visit to Stadium Club, that he observed "[c]ustomers tipping dancers when dancers acted in a sexually provocative manner").

Finally, regarding acts of "sexual stimulation or arousal"—one of the "[s]pecified sexual activities" in 11 DCMR § 199.1—the BZA failed to make adequate factual findings.[14] The BZA erred in omitting such findings, particularly in light of the BZA's prior decision in Appeal No. 13967 (Nov. 22, 1983,

---

[14] The BZA stated that Justin Bellow and Ben Petok testified "that they were not aroused by most, if not all, of the performances they witnessed." Mr. Bellow testified that he was "not particularly" aroused, and when asked to answer "yes or no," answered no. Mr. Petok testified that he was aroused after receiving a lap dance in a back room. With respect to Mr. Petok, the BZA's finding was clearly erroneous. Mr. Petok also testified that he thought a "reasonable man" would have felt aroused.

*California Steak House, Inc.*), in which the BZA decided that "the type of activity observed occurring at the subject premises did constitute 'sexual stimulation or arousal' and was therefore a 'specified sexual activity.'"[15] The BZA in *California Steak House* reached this decision despite no evidence of actual touching and based on "[t]he positions assumed by the women and the manner in which the women displayed themselves." Notwithstanding this precedent, the BZA in this case, while summarizing the *California Steak House* decision, did not explain why the manner in which the women display themselves at Stadium Club, which appears to resemble the manner in which women displayed themselves in *California Steak House*, does not promote sexual stimulation or arousal.[16] We also find it difficult to review any BZA decision on whether Stadium Club features such acts without clarification from the BZA about how it plans to evaluate acts of sexual stimulation or arousal—say, by assessing how the club's performances

---

[15] In *California Steak House*, the establishment appealed the ZA's decision to revoke its certificate of occupancy. The ZA had determined that the establishment was operating as a SOBE, beyond the scope of its certificate of occupancy. In addition to upholding the ZA's decision on the merits, the BZA also dismissed the appeal as not timely filed.

[16] If the BZA has indeed departed from its precedent in *California Steak House*, we will not uphold its decision where it has failed to "supply a reasoned analysis indicating that prior policies and standards are being deliberately changed." *Springer v. District of Columbia Dep't of Emp't Servs.*, 743 A.2d 1213, 1221 (D.C. 1999) (internal quotation marks and citation omitted).

affect reasonable people, or by assessing what the club's specific type of nude dancing is designed to do for or elicit from customers, or by some other metric.

We typically defer to "[a]n agency's interpretation of a statute that it administers." *Bannum*, 894 A.2d at 429. But in this case, the BZA has failed to make key factual findings and has left legal questions unresolved. On remand, the BZA is directed to consider whether the ZA erred in granting Stadium Club the second permanent certificate of occupancy on June 24, 2011, given the information available to the ZA at that time.[17] In particular, the BZA shall consider whether the kind of dancing featured at Stadium Club involves "fondling," "erotic touching," or acts of "sexual stimulation or arousal," as the BZA interprets those terms in light of its precedent. The BZA may consider whether these activities occur despite Stadium Club's "Rules and Regulations for Dancers" that purport to ensure compliance with zoning requirements. The BZA's August 24, 2011, order is vacated and the case is remanded for additional findings of fact, conclusions of

---

[17] In its August 24, 2012, order, the BZA recognized that "issuance of the latest certificate of occupancy did not dispose of the grounds for the appeal." If the ZA has issued superseding certificates of occupancy to Stadium Club during the pendency of this appeal, the BZA should consider whether the ZA erred in issuing the latest certificate given the information available.

law, and proceedings consistent with this opinion.[18]

*So ordered.*

---

[18] Ward 5 also contends we should reverse the BZA's decision as inconsistent with the D.C. Council's intent in its various enactments regulating SOBEs. Given our remand order, we do not reach this issue.